# 21-2566

## United States Court of Appeals
*for the*
### Second Circuit

DR. A., NURSE A., DR. C., NURSE D., DR. F., DR. G., THERAPIST I., DR. J., NURSE J., DR. M., NURSE N., DR. O., DR. P., TECHNOLOGIST P., DR. S., NURSE S., PHYSICIAN LIAISON X,

*Plaintiffs-Appellees,*

v.

KATHY HOCHUL, GOVERNOR OF THE STATE OF NEW YORK, IN HER OFFICIAL CAPACITY, DR. HOWARD A. ZUCKER, COMMISSIONER OF THE NEW YORK STATE DEPARTMENT OF HEALTH, IN HIS OFFICIAL CAPACITY, LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK, IN HER OFFICIAL CAPACITY,

*Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the Northern District of New York (Syracuse), No. 21-cv-1009.
The Honorable **David N. Hurd**, U.S. District Judge and
The Honorable **Miroslav Lovric**, U.S. Magistrate Judge Presiding.

## BRIEF OF PLAINTIFFS-APPELLEES

CHRISTOPHER A. FERRARA
THOMAS MORE SOCIETY
148-29 Cross Island Parkway
Whitestone, Queens,
New York 11357
(718) 357-1040

MICHAEL MCHALE
THOMAS MORE SOCIETY
10506 Burt Circle, Suite 110
Omaha, Nebraska 68114
(402) 501-8586

STEPHEN M. CRAMPTON
THOMAS MORE SOCIETY
309 West Washington Street
Suite 1250
Chicago, Illinois 60606
(662) 255-9439

*Counsel for Plaintiffs-Appellees*

 

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................1

ISSUES PRESENTED..........................................................................3

STATEMENT OF THE CASE..................................................................5

STANDARD OF REVIEW .....................................................................15

SUMMARY OF ARGUMENT ................................................................16

ARGUMENT ........................................................................................20

I.   THE DISTRICT COURT PROPERLY HELD THAT PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ...............................................20

   A.  Courts Have Not Held That Governments Can Impose Vaccine Mandates in Violation of the First Amendment or Civil Rights Laws.......................20

   B.  The DOH Rule Flagrantly Violates the Supremacy Clause By Forbidding Plaintiffs From Seeking Reasonable Accommodations Under Title VII For Their Sincerely Held Religious Beliefs.....................................................25

   C.  The DOH Rule Also Violates the Free Exercise Clause...........................34

      1.   The DOH Rule is not neutral or generally applicable. .........................34

      2.   The DOH Rule violates religious neutrality. .......................................35

      3.   Nor is the DOH Rule generally applicable. ..........................................41

      4.   The DOH Rule Easily Fails Strict Scrutiny. ........................................48

II.   THE DISTRICT COURT PROPERLY HELD THE REMAINING FACTORS FAVOR A PRELIMINARY INJUNCTION. ...........................56

   A.  Irreparable Harm ...................................................................................56

   B.  Public Interest and Balance of Hardships ...............................................59

CONCLUSION.....................................................................................62

# TABLE OF AUTHORITIES

## Cases

*Employment Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 913 n.6 (1990) ................................................................................................................ 23

*Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020) .......... 16, 22, 50

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015) .......... 25

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 803 n.9 (2011) ............................. 54

*Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2608 (2020) .............. 21

*Cent. Rabbinical Cong. of U.S. & Canada*, 763 F.3d 183, 193, 194-95 (2d Cir. 2014) ...................................................................................................................... 36

*Chicago & N.W. Transp. Co. v. Kalo Brick Tile Co.*, 450 U.S. 311, 317 (1981) .... 27

*Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008) .............. 37

*Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990) ........................................................................................................ 16

*Dahl v. Bd. of Trustees of W. Michigan Univ.*, No. 21-2945, 2021 WL 4618519, at *5 (6th Cir. Oct. 7, 2021) ...................................................................................... 53

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015) .............. 28

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) ..............................................................56

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359,

    366 (3d Cir. 1999) ...........................................................................................44

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 155

    (2d Cir. 2016) ....................................................................................... 56, 60

*Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1881 (2001) .........48

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) .......................27

*Haywood v. Drown*, 556 U.S. 729, 734 (2009) ......................................................26

*Jacobson v. Massachusetts*, 197 U.S. 11, 25-27 (1905) ..........................................21

*Mast v. Fillmore Cnty., Minnesota*, 141 S. Ct. 2430, 2433 (2021) ........................51

*Masterpiece Cakeshop, Letd. V. Colo. Civil Rights Com'n*, 138 S. Ct. 1719, 1722

    (2018).............................................................................................................36

*McCullen v. Coakley*, 573 U.S. 464, 495 (2014) ....................................................51

*N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) ..27

*New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 168 (2d Cir. 2008) ..............38

*New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) ......15

*Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105,

    110 (2d Cir. 2014) ........................................................................................16

*Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015)..............................23

*Prince v. Massachusetts*, 321 U.S. 158 (1944).......................................................22

*Roberts v. Neace*, 958 F.3d 409, 415 (6th Cir. 2020) ...............................................37

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020) ..... 21, 38

*Does 1-6 v. Mills*, 2021 WL 4860328 (1st Cir. Oct. 19, 2021) ...............................33

*Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (Apr. 9, 2021) .....................................41

*Thomas v. Review Bd. of Indiana Emp. Security Div.*, 450 U.S 707, 718 (1981) ...50

*Tweed-New Haven Airport Auth. V. Tong*, 930 F.3d 65, 73 (2d Cir. 2009), *cert*

    *denied*, 140 S. Ct. 2508 (2020)................................................................................27

*United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011). ................................56

*United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395.(1948).................................15

*Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20(2008) ...........................15

*Wisconsin v. Yoder*, 406 U.S. 205, 208 (1972) .................................................. 49, 59

*Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. App'x 348 (4th Cir. 2011)

    (unpublished) ..........................................................................................................24

*Wright v. DeWitt Sch. Dist. No. 1 of Arkansas Cty.*, 238 Ark. 906, 910 (1965) .....22

*Yellowbear v. Lampert*, 741 F.3d 48, 61 (10th Cir. 2014).......................................55

*Zervos v. Verizon N.Y., Inc.,* 252 F.3d 163, 169 (2d Cir. 2001) ..............................16

*Zucht v. King*, 260 U.S. 174 (1922) .........................................................................21

## Statutes

10 N.Y.C.R.R § 2.61 ...................................................................................................5

42 U.S.C. § 2000e-(2)(a)(1)&(2) ..............................................................................28

42 U.S.C. § 2000e(j) ........................................................................ 29, 31

42 U.S.C. § 2000e-7 ................................................................................32

42 U.S.C. §§ 2000e-2(a)(2) .....................................................................31

Executive Order: https://www.illinois.gov/government/executive-orders/executive-order.executive-order-number-20.2021.html. .....................................................52

N.Y. Comp. Codes R. & Regs. Tit. 10, § 2.59(d)(2014) ........................................24

Illinois EO 2021-20 (COVID-19 EO No. 87) (Aug. 26, 2021) ...............................52

## Other Authorities

"CDC Travel Recommendations by Destination," updated October 18, 2021, https://www.cdc.gov/coronavirus/2019-ncov/travelers/map-and-travel-notices.html ..................................................................................................13

"Judge's vaccine religious exemption ruling comes as good news for some NY health care workers," Spectrum News, October 12, 2021 ...................................11

"Local health systems react to injunction allowing religious exemptions for healthcare workers," News 10 (Capital Region), October 12, 2021 ....................11

"Tracking Coronavirus in New York: Latest Map and Case Count," *New York Times*, https://www.nytimes.com/interactive/2021/us/new-york-covid-cases.html ......................................................................................................13

CNN Transcripts, Interview with CDC Director Dr. Rochelle Walensky, Aug. 5, 2021 ...................................................................................................52

https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Order-of-the-State-Public-Health-Officer-Health-Care-Worker-Vaccine-Requirement.aspx. .53

https://www.governor.ny.gov/news/rush-transcript-governor-hochul-attends-service-christian-cultural-center (September 26, 2021). ......................................10

https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-hochul-attends-services-abyssinian-baptist-church (September 12, 2021)..........10

https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-hochul-attends-services-abyssinian-baptist-church.............................................40

https://www.governor.ny.gov/news/video-rough-transcript-governor-hochul-holds-qa-following-covid-19-briefing (September 15, 2021) ........................................10

https://www.governor.ny.gov/news/video-rough-transcript-governor-hochul-holds-qa-following-covid-19-briefing. (emphasis added).............................................39

https://youtu.be/nE1O8lXJmYE?t=1030 (October 13, 2021) .................................11

Recommendations of the Advisory Committee on Immunization Practices [ACIP] of the U.S. Department of Health and Human Services......................................46

USA Facts, *New York coronavirus cases and deaths*, updated to October 18, 2021, https://usafacts.org/visualizations/coronavirus-covid-19-spread-map/state/new-york .......................................................................................................................9

**Rules**

Fed. R. Civ. P. 201(c)(2)...........................................................................................40

**Constitutional Provisions**

U.S. Const. Art. VI, cl. 2..........................................................................26

## PRELIMINARY STATEMENT

This case stands for the simple proposition that under the Supremacy Clause of the United States Constitution no "emergency" vaccine mandate by a state health bureaucracy can override the preemptive federal protections for sincerely held religious beliefs under Title VII, nor negate the Free Exercise Clause of the First Amendment.

As to Title VII, this case is *not* a collection of religious discrimination claims on their merits. No employer has been sued herein, and no damages are sought from the State (which is obviously immune from damage claims under the Eleventh Amendment). It is, rather, a plea to remove a state-imposed barrier to the pursuit of Title VII reasonable accommodations for sincere religious beliefs. As the district court recognized: "What matters here is not whether a religious practitioner would win or lose a future Title VII lawsuit. What matters is that plaintiffs' current showing establishes that [the vaccine mandate] has effectively foreclosed the pathway to seeking a religious accommodation that is guaranteed under Title VII." (Appellant's SA 24.)[1]

Having consigned this central issue to a subpoint buried at page 58 of their brief, defendants (collectively, "the State") inexplicably argue that plaintiffs are presenting "a Title VII claim against defendants here" and that "plaintiffs have

---

[1] Hereinafter referred to as "SA."

failed to name a proper Title VII defendant." (OB 60)  It is difficult to attribute the State's fundamental mischaracterization of this case to a good faith mistake.

Defendants also propose a *post hoc*, blatantly litigation-motivated rewrite of the mandate to allow individual employers to accommodate religious objections to COVID vaccination, suggesting that there is a difference between "exemption" and "accommodation"—mere word play the district court readily disposed of: "The plain terms of [the vaccine mandate] do not make room for covered 'entities' to consider requests for reasonable religious accommodations." (SA 23)

But even as defendants hastily engraft an imaginary religious accommodation provision onto the mandate in the evident hope of avoiding an affirmance of the district court's virtually compelled decision, they drastically limit its scope to "reassigning such workers to activities where they would no longer expose others to COVID-19 infection." (*Id.*) In other words, no treatment of patients by doctors and nurses whose profession is to treat them!

When it comes to the issue of free exercise, Defendants de-emphasize their *post litem motam* rewrite of the mandate and argue there must be *no* accommodation of religion, despite the availability of a medical exemption from the mandate, because the mandate is "a neutral, generally applicable requirement" and the medical exemption is "not comparable to plaintiffs' *requested* religious exemption." (OB 28-29)(emphasis added)

In short, Defendants' position is a contorted evasion of the District Court's sound legal conclusions. There is no basis for disturbing Judge Hurd's decision, which, as noted below, has saved many of the plaintiffs and countless others from imminent destruction of their careers in medicine. The District Court's well-bottomed injunction does nothing more than make it possible for medical facilities intent on retaining experienced medical professionals to grant the religious accommodations Title VII allows and even mandates where, as here, there is no "undue hardship" to the employer. The district court has rightly enjoined a bureaucratic dictate that purported to deprive medical care facilities of their lawfully mandated Title VII discretion in this matter while trampling on the Free Exercise Clause.

## ISSUES PRESENTED

1. Whether the District Court abused its discretion in preliminarily enjoining a "vaccine mandate" for medical personnel that attempts to preempt Title VII by precluding otherwise permissible reasonable accommodations of religious objections to COVID-19 vaccination, including even the same protective measures deemed sufficient throughout the pandemic, which measures are still deemed sufficient, in lieu of vaccination, by facilities that have granted or restored religious accommodations because of the injunction.

3

2. Whether the District Court abused its discretion in preliminarily enjoining the vaccine mandate on the ground that it is not a neutral law, and is thus subject to strict scrutiny under the Free Exercise Clause, because it targets religion by stripping the religious exemption provision from the prior version of the mandate promulgated only five days before, which targeting is confirmed by the defendant Governor's public statements that the religious exemption provision was intentionally stricken, that the COVID vaccines are divinely inspired, that "all the religious leaders" agree with her, that religious objectors to vaccination "aren't listening to God and what God wants," and that the State's "public health objective" is necessarily "overriding" the contrary religious beliefs of the minority.

3. Whether the District Court abused its discretion in preliminarily enjoining the vaccine mandate on the ground that it is not a generally applicable law, and is thus likewise subject to strict scrutiny, because it allows medical exemptions from vaccination, permitting the medically exempt to observe the same protective measures deemed sufficient for all medical providers pre-vaccine, while forbidding the same accommodation for those who seek religious exemptions and would observe the same protective measures in the same medical settings.

4. Whether the District Court abused its discretion in finding that the vaccine mandate, being subject to strict scrutiny, is not narrowly tailored because

4

the State made no showing that the same protective measures allowed for medically exempt personnel would not be sufficient for religiously exempt personnel, or that the approaches taken by other states, which allow religious exemptions to their vaccine mandates, would not be sufficient in New York State.

## STATEMENT OF THE CASE

On September 13, 2021, Plaintiffs herein commenced the action below. They did so because, only days before the suit was filed, the State abandoned an "emergency" rule, promulgated by former Health Commissioner Zucker on August 18, 2021, that mandated COVID-19 vaccination by healthcare but provided a religious exemption as follows:

> Covered entities *shall grant a religious exemption* for COVID-19 vaccination for covered personnel if they hold a genuine and sincere religious belief contrary to the practice of immunization, *subject to a reasonable accommodation by the employer*. (SA 45)

As the District Court (Hurd., J.) noted in its Opinion, "Just five days later, on August 23, 2021, New York State's Public Health & Health Planning Council (the "Health Council") … published a proposed emergency regulation that eliminated the religious exemption found in Zucker's August 18 Order." (SA 13-14). This is the challenged vaccine mandate now before this Court. *See* 10 N.Y.C.R.R § 2.61. (SA 48) (hereinafter "DOH Rule")

While the DOH Rule purports to strip away all protections for religious belief under Title VII and the First Amendment, it does allow medical exemptions upon the simple submission of a certification by a doctor or nurse practitioner that the vaccines would be "detrimental to a specific member of a covered entity's personnel, based upon a specific pre-existing health condition…in accordance with generally accepted medical standards." (SA 45).

Under the DOH Rule, all "covered entities" (essentially hospitals, hospices and nursing homes) "shall *continuously* require personnel to be fully vaccinated against COVID-19, with the first dose for current personnel received by September 27, 2021, for general hospitals and nursing homes, and by October 7, 2021 for other covered entities absent receipt of an exemption." (SA 48-49). The meaning of "fully vaccinated," ominously enough, "shall be determined by the Department in accordance with applicable federal guidelines and recommendations." (*Id*). In other words, the subjects of the mandate, including the Plaintiffs here, must be vaccinated for COVID as many times as the government requires. A potentially endless series of "booster shots" now threatens make the entire social contract contingent on periodic vaccination during an "emergency" that morphs as readily as the virus. Our nation has never seen anything like this form of governmental overreach.

The seventeen plaintiffs are "practicing doctors, M.D.s fulfilling their residency requirement, nurses, a nuclear medicine technologist, a cognitive rehabilitation therapist and a physician's liaison." V. Compl. ¶ 36; see also id. ¶¶ 38, 47, 56, 66, 74, 84, 91, 98, 108, 117, 128, 140, 149, 161, 171, 181, 188. They are employed by hospitals and other entities subject to the mandate. See id. ¶ 10.

Plaintiffs all hold the sincere religious belief that they "cannot consent to be inoculated . . . with vaccines that were tested, developed or produced with fetal cell [ ] line[s] derived from procured abortions." V. Compl. ¶ 35; ¶ 37 (stating plaintiffs' beliefs in common). The Complaint alleges, as defendants concede, that all the available COVID-19 "employ fetal cell lines derived from procured abortion in testing, development or production." Id. ¶¶ 9, 36. See Rausch-Phung Decl. ¶¶ 35–45 in opposition to motion for preliminary injunction. (A 223-224). *See* also Opinion.

As the Verified Complaint details, and as the District Court's Opinion notes, "each plaintiff has been denied a religious exemption, or had an existing religious exemption revoked, on the basis of their employers' application of the DOH Rule. Compl. ¶¶ 39–42, 49–51, 58–60, 67–68, 77–78, 85, 92–94, 102, 111–12, 118–23, 129–31, 142–43, 154–56, 162–63, 173–74, 183–85, 189." (SA 15) As the Opinion further noted, the Complaint "alleges that each plaintiff has been threatened with professional discipline, loss of licensure, admitting privileges, reputational harm,

7

and/or the imminent termination of their employment as a result of their refusal to comply with § 2.61. Id. ¶¶ 43–46, 52–55, 61–65, 69–73, 79–83, 86–90, 95–97, 103–07, 113–16, 124–27, 135–39, 144–48, 157–60, 164–65, 168–70, 176–80, 186–87, 190–91." (Id.)

Plaintiffs have proceeded pseudonymously, without objection by the State, given a politically charged climate in which "[t]he same 'front line' healthcare workers hailed as heroes by the media for treating COVID patients before vaccines were available… are now vilified by the same media as pariahs who must be excluded from society until they are vaccinated against their will." (Complaint at ¶ 26). The Complaint further alleges that "[t]he Vaccine Mandate emerges in the context of an atmosphere of fear and irrationality in which the unvaccinated are threatened with being reduced to a caste of untouchables if they will not consent to being injected, even 'continuously,' with vaccines that violate their religious beliefs…" (*Id.*, ¶ 27).

For almost 18 months, the plaintiffs in this action were part of the endlessly praised "front line" in the "battle against COVID." In masks, gloves, and sometimes goggles and face shields, they practiced their profession at the height of the pandemic, and no one even suggested that they posed a danger to the patients in their care. Several of them contracted the virus themselves, recovered and returned to work on the medical front lines, observing the same protective

measures deemed sufficient to ensure the safety of staff and patients. (Complaint, ¶¶ 133, 151 and 172 at A39, A42, A46).

But now, months after former Governor Cuomo formally ended the "state of disaster emergency on June 25, 2021, and with deaths from COVID standing at statistical zero since the beginning of 2021,[2] these same plaintiffs, and thousands of medical practitioners like them, have been rhetorically transmogrified from heroes into disease-carrying heretics—deadly threats to all around them.

As noted in the Preliminary Statement, just as they did below, Defendants here attempt to minimize the effects of their own mandate by suggesting it does not really contravene Title VII but allows for "accommodation" versus "exemption"— that is,  only the "accommodation" the State deems reasonable, which amounts to keeping unvaccinated doctors and nurses away from their patients.  To quote Defendants' argument elsewhere: "Nothing in the emergency rule precludes employers from accommodating religious objectors by giving them to assignments—such as telemedicine—where they would not pose a risk of infection to other personnel, patients, or residents." (OB=Opening Brief 62)

But in public statements that extinguish the Attorney General's creative rewriting of the mandate to allow for this illusory "accommodation," Governor

---

[2] USA Facts, *New York coronavirus cases and deaths*, updated to October 18, 2021, https://usafacts.org/visualizations/coronavirus-covid-19-spread-map/state/new-york

Cuomo's successor by operation of law, Defendant Hochul, has made it quite clear that every single religious dissenter from her vaccination crusade, which she views as a mission from God to promote His divinely inspired COVID vaccines, must be brought into submission or cast into outer darkness:

- "We left off that [a religious exemption] in our regulations intentionally, and… we'll be defending this in court."[3]

- "I'm not aware of a sanctioned religious exemption from any organized religion. In fact, they're encouraging the opposite. They're encouraging their members, everybody from the Pope on down is encouraging people to get vaccinated."[4]

- "I prayed, I prayed to God, God deliver us from this. And then he did. *He inspired the smartest scientists and doctors and researchers to create a vaccine*…. So how can you say no to that? How can you believe that God would give a vaccine that would cause you harm?"[5]

- "And all of you [the vaccinated], have to be not just the *true believers, but our apostles* to go out there and spread the word that we can get out of this once and for all, if *everybody* gets vaccinated."[6]

- "God did answer our prayers. He made the smartest men and women, the scientists, the doctors, the researchers - *he made them come up with a vaccine.* That is from God to us, and we must say, thank you, God. Thank you.  And I wear my 'vaccinated' necklace all the time to say I'm vaccinated. All of you, yes, I know you're vaccinated, you're

---

[3] https://www.governor.ny.gov/news/video-rough-transcript-governor-hochul-holds-qa-following-covid-19-briefing (September 15, 2021).

[4] *Id.*

[5] https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-hochul-attends-services-abyssinian-baptist-church (September 12, 2021).

[6] *Id.*

the smart ones, *but you know there's people out there who aren't listening to God and what God wants. You know who they are*."[7],[8]

- "Oh, I completely understand [religious objections to vaccination], Michael. I have no doubt that people feel strongly about this. But … we also have *a public health objective which is overriding*, and that's the position we're taking in court."[9]

At the moment the District Court acted to enjoin this blatant targeting of religion—or, more precisely, the wrong religious view according to the State—the plaintiffs here and thousands of other conscientious objectors to forced vaccination were facing imminent professional destruction if they would not violate their consciences.

As the District Court was advised, however, the TRO entered before the preliminary injunction had already saved the careers of multiple plaintiffs herein, who were either granted religious exemptions or were having their exemption requests reconsidered. (A 211). The same is true for other victims of the DOH Rule across the state, who were facing imminent termination of employment before the District Court acted to protect their right to seek accommodation under Title VII.[10]

---

[7] https://www.governor.ny.gov/news/rush-transcript-governor-hochul-attends-service-christian-cultural-center (September 26, 2021).

[8] Emphasis added here and elsewhere in this brief unless otherwise indicated.

[9] https://youtu.be/nE1O8lXJmYE?t=1030 (October 13, 2021).

[10] *See, e.g*., "Local health systems react to injunction allowing religious exemptions for healthcare workers," News 10 (Capital Region), October 12, 2021 (Quoting St. Peter's Health System spokesman: "Like every health care organization across New York state, we are watching as the question of religious exemptions for vaccination among health care workers is answered in the courts.

Defendants devote much of their brief to praise of COVID vaccines as "safe and effective." (OB 61). Even if one were to ignore the mounting evidence that they are neither and assume, *arguendo*, that the vaccines are incontestable medical miracles, that would not be relevant to the issues presented here, which involve the right not to be injected with substances one sincerely believes are immorally derived and cannot be taken into one's body without sinning. And yet it must be noted that, as CDC Director Rochelle Walensky admits, the available COVID vaccines do not prevent transmission of the now-prevalent "Delta variant" that is infecting the vaccinated as well as the unvaccinated, which means, says Walensky, that the vaccinated should wear masks indoors *to protect the unvaccinated*. (A 184)

Accordingly, the CDC guidance now provides that even the "fully vaccinated" should wear masks indoors in areas of "substantial or high transmission" of the Delta variant (A 268)—virtually the entire United States,

---

Currently, 229 colleagues across our system have been granted a vaccination exemption for religious reasons.") *See also*, "Judge's vaccine religious exemption ruling comes as good news for some NY health care workers," Spectrum News, October 12, 2021 ("'I'm very glad,' said Unity Hospital nurse Krista Michael. 'What it means to me right now is I can finally exhale. I feel like I've been holding my breath for the last month. So it's good to be able to breathe again and a sigh of relief. Again, I love what I do and I'm really not ready to stop doing what I love to do. I still have a number of years left in me to continue giving of myself and my life to our community and the patients who need my care.'").

according to the CDC's world map[11]—as if no one at all had been vaccinated.  In short, according to the CDC, everyone can infect everyone with the Delta variant, vaccinated or not, so that everyone still needs to wear masks indoors everywhere in the country. This Court can and should judicially notice that most of the country outside the State of New York is ignoring this absurd advice and that there has been no resulting "health disaster," despite all the dire but never-fulfilled predictions of massively deadly "superspreading events."

At this point in the saga of New York's endless COVID-19 "emergency," which somehow persists months after the "state of disaster emergency" was formally ended during the Cuomo administration, it should be readily apparent to an objective observer that the vaccine mandate policy is not only ridiculous but pointlessly damaging to the already thin ranks of healthcare providers urgently needed to treat innumerable serious medical conditions  besides a virus whose death toll on October 19, 2021 was seven people out of a population of nearly 20,000,000 New Yorkers.[12]

But even if the vaccine mandate were unquestionably necessary as a general proposition, it is long past time for the federal judiciary to rein in New York's out-of-control vaccination inquisition, led by a Governor who openly declares her

---

[11] "CDC Travel Recommendations by Destination," updated October 18, 2021, https://www.cdc.gov/coronavirus/2019-ncov/travelers/map-and-travel-notices.html

[12]"Tracking Coronavirus in New York: Latest Map and Case Count," *New York Times*, https://www.nytimes.com/interactive/2021/us/new-york-covid-cases.html

intention to coerce every single healthcare worker with a religious objection to be inoculated because that is "what God wants," no matter what dissenters from her divinely ordained mission believe to the contrary. The District Court applied the necessary injunctive restraint to this institutional lunacy, recognizing the sane approach taken by nearly every other state in the Union. (SA 31-32)

Under Title VII and the strict scrutiny required by the First Amendment, the District Court was well within its discretion to enjoin New York's attempt to coerce believers to be injected with vaccines they never needed before to practice their profession safely.[13] And the religious accommodations made possible by the injunction put the lie to any claim of "undue burden" on employers. Therefore, no significant state interest, much less a compelling one, justifies New York's unprecedented attempt to nullify the preemptive protections of Title VII while trampling on the Free Exercise Clause.

Indeed, a bureaucratic mandate that purports to further public health by provoking the mass removal of urgently needed doctors and nurses from their posts, while the medically exempt are allowed to practice medicine with *the same*

---

[13] In fact, the State's own data, involving 46,000 data points, showed as of December 2020, 74% of the spread of COVID-19 was occurring in households and social gatherings, while only 7.8% was traceable to healthcare delivery. *See "*By the Facts: 46,000 Data Points," https://youtu.be/QA1TdlK146Y?t=564

*health precautions everyone observed pre-vaccine*, should not even survive rational basis review.

## **STANDARD OF REVIEW**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20(2008).

The grant or denial of a preliminary injunction is reviewed for abuse of discretion. "Such an abuse occurs when the district court bases its ruling on an incorrect legal standard or on a clearly erroneous assessment of the facts." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013).

A finding of fact is "clearly erroneous" only if the reviewing court is "left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395.(1948). As for conclusions of law, while this Court's review is *de novo*, "the ultimate decision to issue the injunction" is reviewed under the abuse of discretion standard. *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020).

A district court abuses its discretion in granting a preliminary injunction only if its decision is based "on an erroneous view of the law or on a clearly erroneous

assessment of the evidence," *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990), or its decision "cannot be located within the range of permissible decisions." *Zervos v. Verizon N.Y., Inc.,* 252 F.3d 163, 169 (2d Cir. 2001).

Where, as here, the injunction stays enforcement of a state executive branch "emergency" order, this Court "grant[s] no special deference to the executive when the exercise of emergency powers infringes on constitutional rights" because "courts may not defer to the Governor simply because he is addressing a matter involving science or public health." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020). This is so even though, more generally, governmental policies implemented through legislation or regulations "should not be enjoined lightly." *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs*., 769 F.3d 105, 110 (2d Cir. 2014).

## SUMMARY OF ARGUMENT

Defendants have not shown the District Court abused its discretion in granting a preliminary exemption against the omission of a religious exemption in New York's healthcare worker vaccine mandate, N.Y. Comp. Codes R. & Regs. Tit. 10, § 2.61(c)(2021) ("DOH Rule"). Thus this Court should affirm.

I.    The District Court properly held that Plaintiffs are likely to succeed on the merits of their constitutional claims. Contrary to Defendants' assertions,

courts have not held that state governments may impose vaccine mandates in a manner that violates federal civil rights and constitutional protections. Plaintiffs' citations are mostly to state laws requiring vaccination for school children and to century-old cases that do not map onto today's jurisprudential and social frameworks, as this Court itself has recognized.

As the District Court held, Plaintiffs are likely to succeed on their preemption claim that the DOH Rule violates the Supremacy Clause because it directly conflicts with the requirements of Title VII of the 1964 Civil Rights Act. The DOH Rule expressly requires all covered personnel (including all Plaintiffs in this case) to be *continuously vaccinated* "except" as provided in "subdivision (d)," which subdivision allows only for limited "medical exemptions." This schematic directly conflicts with Title VII, which requires employers to also reasonably accommodate sincere religious beliefs unless doing so would pose an undue hardship to the employer. The District Court properly held the plain text of the DOH Rule leaves no room for permitted reasonable accommodations under Title VII. Defendants argue in litigation that Title VII does not require more liberal accommodations and the DOH Rule leaves room to offer *some* "accommodations"—i.e., just telemedicine, which is not even subject to the mandate. Defendants fatally admit that even their post hoc interpretation does *not* allow for accommodations that authorize "in-person" healthcare work while

exercising proper protocols, even though many healthcare employers (including some of Plaintiffs' own) have not deemed such accommodations to be an undue hardship. Thus the DOH Rule is preempted by Title VII under the Supremacy Clause.

As the District Court also held, Plaintiffs are likely to succeed on their Free Exercise Clause Claim because the DOH Rule burdens Plaintiffs' religious exercise and is not a neutral law of general applicability, and as such cannot satisfy strict scrutiny. The rule fails the test of religious neutrality because it specifically targeted religious exercise by removing a religious exemption from the final DOH Rule after expressly including one in the prior version of the mandate just days before. Additionally, recent public statements by Governor Hochul casting doubt on the legitimacy of Plaintiffs' religious beliefs and expressing hostility to anyone who religiously opposes COVID vaccination confirm the complete lack of religious neutrality underlying the DOH Rule, thus triggering strict scrutiny.

The DOH Rule is also not generally applicable because it categorically forbids all religious exemptions while specifically authorizing at least some medical exemptions. As the District Court properly held, medical exemptions from vaccination directly undermine the government's stated premise that unvaccinated healthcare workers pose an "unacceptably high risk" of spreading COVID to vulnerable patients and colleagues, and thus medical exemptees "could" pose the

same sort of risk as religious exemptees, rendering the rule non-generally applicable. Defendants incorrectly argue that a predicted greater number of religious exemptions would pose a greater risk of COVID spread than limited medical exemptions, which is purely speculative given that under the DOH Rule employers would still be free to deny religious accommodations if they deemed them an undue hardship—i.e., an undue risk. Moreover, the inquiry at this stage is whether medical exemptees pose similar risks to *Plaintiffs* in this case and not potential religious exemptees in the aggregate.

The District Court properly held the DOH Rule cannot satisfy strict scrutiny because (1) the government does not have a compelling interest in denying Plaintiffs even the opportunity to seek a religious exemption, because its willingness to authorize medical exemptions undermines the notion that its interest in full vaccination can brook no departures; and (2) the government cannot show the DOH Rule is the least restrictive means of achieving its interest, in part because it has failed to show why it cannot follow the practices of nearly all other jurisdictions, including California and Illinois, which authorize religious exemptions from similar mandates. Thus the DOH Rule fails strict scrutiny and Plaintiffs are likely to succeed on their Free Exercise Claim.

II. Finally, the District Court properly held that the remaining preliminary injunction factors all favored plaintiffs. Here, Plaintiffs have shown

irreparable harm in part because violation of federal preemption and the First Amendment are recognized forms of irreparable harm. The presence of these harms means a preliminary injunction is in the public interest and that the balance of hardships Plaintiffs.

Moreover, the DOH Rule has been enjoined since September 14, 2021, when the District Court issued its initial TRO, and after which many healthcare workers were restored to their jobs (thus advancing the public interest in adequate healthcare staffing). Yet Defendants have failed to present a scintilla of evidence that the District Court's injunction has had any negative consequences on public health. In reality, the District Court's preliminary injunction preserves Plaintiffs' constitutional rights at the service of public health.

This Court should affirm.

## ARGUMENT

## I.  THE DISTRICT COURT PROPERLY HELD THAT PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.  Courts Have Not Held That Governments Can Impose Vaccine Mandates in Violation of the First Amendment or Civil Rights Laws.

This case is not about government *power* to issue vaccine mandates under appropriate circumstances. It's about whether a state can do so *in a manner* that violates federal civil rights protections and the First Amendment. Defendants'

opening brief immediately misdirects the inquiry by declaring that the Supreme Court has upheld "mandatory vaccination laws" *in general* per its more-than-century-old decision in *Jacobson v. Massachusetts*, 197 U.S. 11, 25-27 (1905). (App'nts. Br. 31.) But *Jacobson* upheld only the vaccine mandate at issue *in that case*. *Id*. at 39.[14]

Defendants' very next citation undermines their argument. (App'nts Br. 31) In *Zucht v. King*, 260 U.S. 174 (1922), while the Supreme Court found no substantial question as to whether San Antonio had the *power* under *Jacobson* to require mandatory vaccination for children entering schools, the Court also held that plaintiff *did* "present a substantial constitutional question" as to whether *application* of the vaccine mandate violated the Equal Protection Clause. *Id*. at 176, 177. The Supreme Court's holding in *Zucht* confirms that state and local governments do not have a blank check to impose vaccine mandates in violation of federal law.[15]

---

[14] Further, at least four Supreme Court Justices have recently criticized *Jacobson*'s application to First Amendment challenges to religion-restrictive COVID-19 mandates. *See Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2608 (2020) (Alito, J., concurring) (joined by Thomas, J., and Kavanaugh, J.); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring).

[15] Contrary to Defendants' argument, the District Court here did not erroneously question the applicability of *Jacobson* (OB Br. 32), because just last year this Court recognized that *Jacobson* "involved an entirely different mode of an analysis, an entirely different right, and an entirely different restriction" than at issue in COVID-19 civil rights cases, and it acknowledged that state police powers

Defendants then cite a series of cases upholding vaccine mandates without religious exemptions. But nearly all of these pertain to vaccine mandates imposed on *children* entering school, over which, as one of Defendants' cited cases put it, "the authority to supervise and control the activities of children is broader than that over similar actions of adults." *Wright v. DeWitt Sch. Dist. No. 1 of Arkansas Cty.*, 238 Ark. 906, 910 (1965) (citing *Prince v. Massachusetts*, 321 U.S. 158 (1944)); *see also id.* at 911 ("[a]cting to guard the general interest in youth's well-being, the state as *parens patriae* may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways.").

Defendants unsurprisingly also point to this Court's relatively recent statement that New York's now-rescinded provision for religious exemptions from a childhood school vaccine mandate "goes beyond what the Constitution requires." *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015). However, Plaintiffs are well aware they are operating under the law of *Employment Division v. Smith*, under which government could likely ban Holy Communion in the Roman Catholic Church. *Employment Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 913 n.6 (1990) (Blackmun, J, dissenting). So the statement in *Phillips* is

do not justify enacting "public-health measures" that violate the Constitution. *Agudath Israel of America v. Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020) (quoting *Brooklyn Diocese*, 141 S. Ct. at 70 (Gorsuch, J., concurring)); *see also Calvary Chapel*, 140 S. Ct. at 2608 (Alito, J., concurring) (noting that *Jacobson* involved a *local* vaccine mandate and not an "indefinite" "statewide" mandate in alleged violation of the First Amendment).

hardly surprising. But Plaintiffs' position remains that a vaccine mandate cannot be imposed *in a manner* that violates federal Title VII or the Free Exercise Clause, which is to say that state governments do not have supreme and unlimited power in this matter.

Defendants argue the DOH Rule's omission of a religious exemption "is not an outlier." (App'nts Br. 33.) But aside from noting New York's requirement that healthcare workers be vaccinated against measles and rubella" without a religious exemption (which would also violate Title VII to the extent any healthcare employer does not find substitutionary precautions to be an undue hardship),[16] literally all of the laws to which New York cites are school vaccination mandates for minor children (none of whom are protected by Title VII) (App'nts Br. 34.) The citation to California is particularly misleading given that California's parallel COVID-19 vaccine mandate for *healthcare workers* expressly *includes* a religious exemption. *See* California, State Public Health Officer Order of August 5, 2021, Sec. 2.[17] Defendants also point out the Fourth Circuit recently denied a Free Exercise Challenge to West Virginia's "childhood vaccination statute" despite the existence of a medical exemption, but it ignores that the plaintiff there did not even argue the medical exemption rendered the policy non-generally applicable, and

---

[16] It's notable that Defendants have presented not even one example of such an employer in this case.

[17] https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Order-of-the-State-Public-Health-Officer-Health-Care-Worker-Vaccine-Requirement.aspx.

thus the Court did not even grapple with the issue. *Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. App'x 348 (4th Cir. 2011) (unpublished).

Moreover, New York expressly recognizes religious exemptions to vaccine mandates in more analogous situations. NYS Public Health Law 2165 requires vaccination against measles, mumps, and rubella for postsecondary students, **but expressly authorizes "religious exemptions" for "genuine and sincere religious beliefs** which are contrary to the practice of immunization."[18] And as the District Court noted, New York allows healthcare workers who are not vaccinated against influenza to "wear a surgical or procedural mask while in areas where patients or residents are typically present." N.Y. Comp. Codes R. & Regs. Tit. 10, § 2.59(d)(2014). (SA 25.) Thus, as the District Court observed, New York's "healthcare regulatory framework is not monolithic when it comes to workplace immunization requirements." (Id.)

Contrary to Defendants' bald assertions, it is hardly "settled law" that a state vaccine mandate without any religious exemptions complies with the Constitution—especially as to adults with express civil rights protections under Title VII, and where the mandate expressly allows for medical exemptions that allow the possible spread of disease. New York's DOH Rule contains both flaws.

---

[18] https://www.health.ny.gov/prevention/immunization/schools/docs/mmr_outbreak_response_planning.pdf.

And it's for that reason the District Court properly held that Plaintiffs are likely to succeed on the merits of their constitutional claims.

    B.    **The DOH Rule Flagrantly Violates the Supremacy Clause By Forbidding Plaintiffs From Seeking Reasonable Accommodations Under Title VII For Their Sincerely Held Religious Beliefs.**

As the District Court properly held, the most glaring flaw in the DOH Rule is that it blatantly "runs afoul of the Supremacy Clause because it is preempted by Title VII." (SA 21.)  Defendants' failure to reach this primary issue until page 58 of their opening brief is telling.[19]  Indeed, Defendants find themselves in a constitutional quandary from which they attempt to extricate themselves by announcing (via post hoc litigation briefing) that the DOH Rule is not preempted because it actually *allows* "accommodations" in compliance with Title VII.  But, as they make clear, only *one kind of* accommodation—telemedicine—is allowed under their newly engrafted *state-delimited*-reasonable-accommodation requirement of Title VII. (OB 62-63.)  Yet telemedicine is not even covered by the Rule, so the hastily invented "accommodation" is illusory.

---

[19] Defendants argue Plaintiffs improperly "styled" their claim as a "Supremacy Clause" claim (OB 58 n.39), but they blink the fact laws are preempted *because* they *violate the Supremacy Clause*, *see infa*, even though preemption claims are considered under this Court's equitable powers and not as an implied right of action under the Supremacy Clause—as Plaintiffs explained below. (ECF No. 5-1, Br. 6 n.1.) *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015).

In reality, Title VII leaves these reasonable accommodation decisions to employers and thus directly preempts the DOH Rule. Even the government's post-hoc attempted rewrite of the Rule (whose plain terms, as shown below, "do not make room" even "to consider religious requests for reasonable religious accommodations," SA 23) is preempted by Title VII, as proven by the fact **numerous hospitals in New York have apparently *not* found it an "undue hardship" to welcome religious exemptees back to the front-lines** (with proper precautions) under the District Court's Temporary Restraining Order and Preliminary Injunction. (*See supra* n.9; and A 211.) This Court should affirm the District Court on at least that basis alone.

Under the Supremacy Clause of the U.S. Constitution, federal law "shall be the supreme law of the Land; and the Judges in every State shall be bound thereby, anything in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2. Thus, the Supreme Court "has long made clear that federal law is as much the law of the several states as are the laws passed by their legislatures." *Haywood v. Drown*, 556 U.S. 729, 734 (2009). And "under the Supremacy Clause . . . any state law, *however clearly within a State's acknowledged power*, which interferes with or is contrary to federal law, *must yield*." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (emphasis added).

26

As this Court recently put it, "[i]f the Supremacy Clause means anything, it means that a state is not free to enforce within its boundaries laws preempted by federal law," and "[l]awsuits invoking the Supremacy Clause are one of the main ways of ensuring that this does not occur." *Tweed-New Haven Airport Auth. V. Tong*, 930 F.3d 65, 73 (2d Cir. 2009), *cert denied*, 140 S. Ct. 2508 (2020); *see also Chicago & N.W. Transp. Co. v. Kalo Brick Tile Co.*, 450 U.S. 311, 317 (1981) ("[T]he Supremacy Clause invalidates state laws that interfere with or are contrary to the laws of [C]ongress.").

The DOH Rule is patently preempted under the Supremacy Clause, as a form of "conflict preemption." *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010). That's because the Rule is a direct "obstacle to the achievement of federal" objectives under Title VII, *id.*., which makes it unlawful for covered employers to "discharge," "otherwise discriminate," or even "segregate . . . in any way which would . . . tend to deprive" an individual of "employment opportunities," or which would "otherwise adversely affect" an individual's status as an employee "*because of such individual's . . . religion*." 42 U.S.C. § 2000e-(2)(a)(1)&(2) (emphasis added).

Critically, "religion" is defined to mean "all aspects of religious observance and practice, as well as belief, *unless* an employer *demonstrates* that he is unable to reasonably accommodate . . . an employee's . . . religious observance or practice

without undue hardship" on "the employer's business." *Id.* § 2000e(j) (emphasis added). In practice, this means that as a matter of *federal* law, Title VII *prohibits* an employer from discriminating against an employee "in order to avoid accommodating a religious practice that it could accommodate without an undue hardship." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015). This rule applies even to *neutral* policies that *incidentally* burden people of faith. *See id.* at 775 ("An employer is surely entitled to have, for example, a no-headwear policy as an ordinary matter," but Title VII gives religious practices "favored treatment" and "requires otherwise neutral policies to give way to the need for an accommodation").

As the District Court properly held, the "plain terms" of the DOH Rule simply leave no room for Plaintiffs' employers even "to consider requests for reasonable accommodations" for religious conflicts.  (SA 23.) The Rule plainly states that "[c]overed entities **shall continuously require personnel to be fully vaccinated** against COVID-19," with documentation made in appropriate personnel records, "**except as set forth in subdivision (d) of this section.**" (§ 2.61(c), SA 48-49 (emphasis added).) In turn, subdivision (d) provides that "[p]ersonnel shall be exempt from the COVID-19 vaccination requirements set forth in subdivision (c) of this section" *only* if they qualify for an appropriate "Medical exemption." (§ 2.61(d)(1), SA49.) Accordingly, between subdivision

28

(c)'s mandate that *all* personnel of covered entities be *continuously vaccinated* against COVID-19 "**except**" as provided in "subdivision (d) of this section," on the one hand, and subdivision (d)'s *exclusive* allowance of "medical exemptions," on the other, there is simply no room for Plaintiffs' employers even to consider their reasonable religious accommodation requests *as required by federal law under Title VII*. *See* 42 U.S.C. § 2000e(j) (employers must accommodate sincerely held religious beliefs *unless* they "demonstrate" such accommodations would be an "undue hardship").

Plaintiffs' experience only confirms this direct conflict. Four plaintiffs had previously received religious exemptions from COVID vaccination by their employers, who had effectively deemed such exemptions *not* to be an "undue hardship" under Title VII—yet all four exemptions were revoked as a direct result of the DOH Rule. (V. Cmplt. ¶¶49, 77, 142, 174.) The remaining Plaintiffs were all denied religious exemptions or informed any requests would be futile because of the DOH Rule, (id. ¶¶39-40, 58-60, 67, 85, 94, 102, 111, 120, 130, 155-56, 163, 185, 189), with one employer even saying it could no longer offer religious exemptions "*much to our disappointment*," and another: "*my hands are tied*," (id. ¶¶111, 112 (emphasis added)). Thus, it's clear that Plaintiffs' employers all interpreted the DOH rule the same way the District Court did: COVID-19 vaccination is *continuously required for all personnel*, "**except**" for appropriate

29

medical exceptions, with no religious exemptions allowed, **even if an employer does not deem them an undue hardship.**

Plainly aware of this quandary, Defendants argue that nothing in the DOH Rule prevents employers from "accommodating religious objectors by giving them "telemedicine" assignments that do not threaten others in healthcare settings with COVID infection. (OB 62.) But it is already the case that the DOH Rule's definition of "personnel" who are required to be vaccinated does *not* reach those whose "activities" would not "potentially expose other covered personnel, patients or residents to the diseases" (§ 2.61(a)(2)). Further, Defendants' position runs headlong into the Supremacy Clause when they admit "the emergency rule" categorically "*precludes* plaintiffs from . . . continu[ing] [to] work[] with other staff, patients, and residents despite being unvaccinated," (id. 63 (emphasis added)), *even if* their employers would not deem such activity, as undertaken with proper and even extra precautions, to be an "undue hardship" under Title VII.

Defendants repeatedly insist that a religious "exemption"—i.e., in-person healthcare services with proper accommodating precautions—is not *required* by Title VII. (Id. 40, 62 n.40, 63). But they repeatedly fail to mention that nothing in Title VII *prohibits* it either, so long as employers do not deem it an undue hardship. 42 U.S.C. § 2000e(j). And, as mentioned, this is indeed the position of many healthcare employers across New York following the District Court's

30

issuance of the TRO and preliminary injunction, given that multiple Plaintiffs and other healthcare workers across the state have since been granted religious exemptions and returned to their heroic front-line work while exercising the precautions required by their employers. (A 211, and *supra* n. 9 and accompanying text.) Defendants' post hoc litigation position that those employees must now be relegated to telemedicine work at best only further violates the Supremacy Clause, as Title VII prohibits even "segregat[ing]" religious objectors based on their religious beliefs when those beliefs can otherwise be accommodated without undue hardship. 42 U.S.C. §§ 2000e-2(a)(2), 2000e(j). Simply put, no matter how hard Defendants try, they cannot obscure the DOH Rule's glaring conflict with the requirements of Title VII.

Defendants' remaining objections to Plaintiffs' Supremacy Clause preemption claim are entirely unavailing. They argue that Plaintiffs have sued the wrong party, but that argument erroneously assumes Plaintiffs have brought a *Title VII claim* rather than a preemption claim. (OB 58-59.) Yet Plaintiffs have not sued their employers for violating Title VII, but rather are seeking an injunction preventing the State from interfering with their employers' Title VII duties to consider their requests for religious accommodations. (V. Cmplt. ¶¶210-219.) Defendants also argue Plaintiffs have failed to identify "concrete Title VII injuries," but this argument likewise mischaracterizes this case. (OB 60-61.)

Defendants further assert that Title VII explicitly states it does not "exempt" anyone from a state-law requirement, yet they themselves acknowledge this is on the express condition that a state not "require" an "act which would be an unlawful employment practice" (id. 62 (quoting 42 U.S.C. § 2000e-7)). But that is exactly what the DOH Rule does by requiring that employers categorically deny Plaintiffs' requests for religious exemption/accommodation (or segregate them in a telemedicine quarantine) **even if the employer would not deem it an undue hardship**.

Finally, defendants argue that Plaintiffs' requested accommodations would actually be an "undue hardship" (i.e., a risk to workplace safety and public health and thus more than a de minimis cost), **but that is precisely what Title VII requires employers themselves to "demonstrate"** under federal law. 42 U.S.C. § 2000e(j). Once again, this is not a Title VII case, and Defendants' own arguments, which attempt to dictate Title VII outcomes, belie their claim that the DOH Rule is not preempted under the Supremacy Clause.

The First Circuit's recent decision appearing to deny a similar challenge is readily distinguishable. *See Does 1-6 v. Mills*, 2021 WL 4860328 (1st Cir. Oct. 19, 2021). First, the Court there wrongly stated "[t]he *Dr. A.* plaintiffs also raised **Title VII claims**" that "[w]e believe . . . erroneous for the same reasons the appellants' Title VII claims here." *Id.* at 9 n.10 (emphasis added). As already emphasized,

32

Plaintiffs here have *not* brought Title VII claims, whereas in *Mills* the plaintiffs indeed brought Title VII claims against their employing hospitals. *Id.* at *1, 10 (rejecting Title VII claims for failing to meet the standard for enjoining termination of employment).

Additionally, the First Circuit rejected a Supremacy Clause challenge for a reason completely inapplicable here: plaintiffs' claim there hinged on an assertion that their employers acted in concert with the State and denied the applicability of Title VII. But the Court found plaintiffs' hospitals indeed recognized the applicability of Title VII but arrived at the conclusion that Title VII did not *require* the religious exemptions plaintiffs were seeking. *Id.* at *10. Plaintiffs here do not argue otherwise, and they are not alleging a conspiracy between their employers and the state or that this Court must enter an injunction ordering their employers to grant religious exemptions. **They merely seek an injunction prohibiting the state from interfering with their employers' Title VII discretion** to consider their religious accommodation requests and determine the degree to which they can accommodate them without undue hardship. (*See, e.g.* V. Cmplt. ¶216; *see also* ¶¶49, 77, 142, 174, noting Plaintiffs whose employers revoked religious exemptions/accommodations otherwise permitted under Title VII; *see also* A 211, noting that several Plaintiffs' employers restored or granted religious accommodations after the District Court temporarily enjoined the DOH Rule.)

All told, the DOH Rule directly conflicts with Plaintiffs' Title VII rights to seek religious accommodations from their employers that, in their employers' determination, do not pose an undue hardship. Plaintiffs are thus likely to succeed on their Supremacy Clause preemption claim.

### C. The DOH Rule Also Violates the Free Exercise Clause.

#### 1. The DOH Rule is not neutral or generally applicable.

Defendants do not deny that the DOH Rule burdens Plaintiffs' sincerely held religious beliefs. But, contrary to Defendants' arguments, the DOH Rule is a quintessential *non*-neutral and *non*-generally applicable burden on religion and cannot satisfy strict scrutiny under the Free Exercise Clause.

As the District Court properly held, the recent series of events leading to the DOH Rule's promulgation confirm that it *targeted* religion for disparate treatment by removing the religious exemption in the prior Health Order, enacted only days before. (V. Cmplt .¶¶ 2, 20.) This blatant religious targeting has been embarrassingly confirmed by Governor Hochul's bizarre anti-religious statements throughout this litigation in support of the DOH Rule's elimination of a religious exemption. (*See supra*.)

The District Court also correctly held that the DOH Rule is non-generally applicable because it categorically permits *medical* exemptees who, as compared to a religious exemptee, pose *at least the same degree of risk* of spreading or

34

contracting COVID and its delta variant to/from fellow colleagues and vulnerable patients—directly undermining the express, actual purpose of the DOH Rule and thus triggering strict scrutiny. Contrary to Defendants' argument, it's no answer to say that religious exemptions would far outnumber medical exemptions because here the Free Exercise Clause requires only that New York *allow covered healthcare employers to independently consider religious exemption requests* to the extent they're allowed to consider medical exemption requests. **The Title VII "interactive process" is the gate through which religious exemption requests must pass, limiting the number granted. The State has no authority to close the gate entirely.**

As the District Court emphasized, the injunction Plaintiffs seek does not *require* employers to grant religious accommodations. (SA 34.) Further, Defendants wrongly (and bizarrely) argue they need not satisfy the *particularized* compelling interest or *least restrictive means* tests—both of which are well established First Amendment standards, and both of which they fail.

### 2. The DOH Rule violates religious neutrality.

A regulation is not a neutral burden on religion if it discriminates against religious practice on its face, or if in its real operation it targets a religious practice.

*Cent. Rabbinical Cong. of U.S. & Canada*, 763 F.3d 183, 193, 194-95 (2d Cir. 2014). "[T]he specific series of events leading to the enactment or official policy in question" is relevant in detecting lack of neutrality. *Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 211 (2d Cir. 2012). Other "[f]actors relevant to th[is] assessment . . . include 'the historical background of the decision under challenge . . . and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.'" *Masterpiece Cakeshop, Letd. V. Colo. Civil Rights Com'n*, 138 S. Ct. 1719, 1722 (2018) (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 540 (1993)).

Defendants err in saying a plaintiff must show "hostility or animus" toward religion to establish lack of neutrality. (OB 36.) "The constitutional benchmark is 'government *neutrality*,' not 'governmental avoidance of bigotry.'" *Roberts v. Neace*, 958 F.3d 409, 415 (6th Cir. 2020) (emphasis in original) (quoting *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008)); *see also Shrum v. City of Coweta*, 449 F.3d 1132, 1145 (10th Cir. 2006) ("[T]he Free Exercise Clause is not confined to actions based on animus.") Thus, although Governor Hochul's comments plainly reveal anti-religious animus underlying the DOH Rule, such anti-religious bigotry is not necessary for an injunction.

Here, as the District Court held, the specific events and historical background leading to the DOH Rule's elimination of any religious exemptions show that it effective targeted religious objections to COVID-19 vaccination. The fact Defendant Zucker's prior August 18th Health Order specifically provided that covered entities "*shall grant a religious exemption* . . . subject to a reasonable accommodation by the employer" (SA 45) (emphasis added), before DOH specifically eliminated any religious exemption from the final DOH Rule on August 26th, demonstrates that Defendants *singled out* religion for special disparate treatment.

Defendants argue on appeal that the DOH Rule is neutral because it "does not mention religious activity at all" on its face. (OB 36.) But facial neutrality is only a "minimum requirement of neutrality" and does not immunize a law whose "circumstances" reveal "subtle departures from neutrality" amounting to impermissible "religious gerrymanders." *Lukumi*, 508 U.S. at 533-34. Although Defendants characterize the August 18th order as a temporary "stop-gap measure" (id. 38), and say the subsequent removal of religious exemptions was simply to harmonize with longstanding measles and rubella vaccine mandates (id. 39), these arguments do nothing to undermine the District Court's conclusion that the final DOH Rule's "intentional change in language" *specifically excising the prior*

37

*religious exemption* is the kind of religious targeting that at least "triggers heightened scrutiny." (SA 28.)

Governor Hochul's aforementioned statements only crystalize this lack of neutrality. The Second Circuit has made clear that anti-religious statements by public officials or spokespersons even *after* initial rule promulgation are relevant in discerning non-neutrality. *See New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 168 (2d Cir. 2008) (agency official's biased response to plaintiff's protests against an already promulgated challenged rule, and a spokeswoman's later statement to a reporter that "[t]here is no place for [adoption] providers that choose not to follow the law," were relevant in evaluating the rule's lack of neutrality); *accord Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020) (noting that "statements made *in connection with* the challenged rules" by then-Governor Cuomo "can be viewed as targeting the ultra-Orthodox Jewish Community") (emphasis added) (cleaned up). The Supreme Court has also condemned statements by public officials that "endorse the impermissible view 'that religious beliefs cannot legitimately be carried into the public sphere or commercial domain, implying that religious beliefs and persons are less than fully welcome in [the state's] business community.'" *Id.* at 169 n.22 (quoting *Masterpiece*, 138 S. Ct. at 1729)).

Here, Governor Hochul has openly justified the DOH Rule's omission of a religious exemption based on her own view that healthcare workers cannot hold *legitimate* religious objections to COVID-19 vaccination. When asked on September 15th if she believed the "healthcare workers" in this very litigation "should be allowed to have a religious exemption to not get vaccinated," she responded: "I'm not aware of a *sanctioned* religious exemption from any organized religion . . . everybody from the *Pope on down* is encouraging their members to get vaccinated."[20] **Governor Hochul's statement is especially relevant here given that she took office on August 24th, just two days before DOH officially removed religious exemptions from the final rule**. *See Masterpiece*, 138 S. Ct. at 1731 ("It hardly requires restating that government has no role in deciding or even suggesting whether the religious ground for [an individual's] conscience-based objections is legitimate or illegitimate.").

Governor Hochul also has brazenly expressed "impermissible" hostility to all healthcare workers who dare forego the vaccine for religious reasons, stating in the most blunt, religiously bigoted terms possible: "God . . . inspired the smartest scientists and doctors and researchers to create a vaccine . . . so how can you say no to that? How can you believe that God would give a vaccine that would cause

---

[20] https://www.governor.ny.gov/news/video-rough-transcript-governor-hochul-holds-qa-following-covid-19-briefing. (emphasis added)

you harm?,"[21] and "I know you're vaccinated, you're the smart ones, but you know there's people out there who aren't listening to God and what God wants. *You know who they are*."[22] In light of the First Amendment and its roots in the escape from religious oppression in England, Hochul's sanctimonious sermonizing in aid of her vaccine crusade is nothing less than an embarrassment to the State of New York.

Defendants say the District Court did not identify or rely on any anti-religious statements in considering the DOH Rule's neutrality. (OB 38.) But nearly all of Governor Hochul's above comments came after Plaintiffs filed this suit on September 13th (*see supra* n.4-8), and the District Court expressly prohibited them from making any reply and thus further developing the record after Defendants filed their opposition papers. (SA 4.) This Court, however, can take judicial notice of these statements ("from sources whose accuracy cannot reasonably be questioned"), published by the Governor herself, "at any stage of the proceeding," Fed. R. Civ. P. 201(c)(2). These unprecedented statements by a sitting Governor clearly demonstrate the correctness of the District Court's conclusion that the DOH Rule violates religious neutrality.

---

[21] https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-hochul-attends-services-abyssinian-baptist-church.

[22] https://www.governor.ny.gov/news/rush-transcript-governor-hochul-attends-service-christian-cultural-center (emphasis added).

Finally, on this point it is crucial to note that in rejecting a non-neutrality claim against an ostensibly similar mandate in Maine, the First Circuit distinguished the District Court's decision here because it relied on the fact New York "eliminate[d] the religious exemption" just eight days after including one in the prior version of the mandate, and thus "singled out religious believers through a 'religious gerrymander.'" *Mills*, 2021 WL 4860328, at *9.

### 3. Nor is the DOH Rule generally applicable.

A religion-burdening regulation is not generally applicable where it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (Apr. 9, 2021) (emphasis in original). And "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue," including activities that "*could* . . . present[] similar risks" of "spread[ing]" COVID-19." *Id*. (emphasis added) (internal quotations).

As the District Court properly found, allowing an individual to obtain a medical exemption undermines the policy's stated interest in ensuring all healthcare workers are vaccinated to prevent the spread of COVID to fellow colleagues and patients, rendering the policy substantially underinclusive as to its purpose and thus non-generally applicable.

41

The DOH Rule states that its provisions are necessary in light of "a concerning national trend of increasing circulation of the SARS-CoV-2 Delta variant," and unvaccinated healthcare personnel "have an unacceptably high risk of both acquiring COVID-19 and transmitting the virus to colleagues and/or vulnerable patients or residents." (SA 37 (§ 2.61 "Needs and Benefits").) But the Mandate expressly *accepts* this risk for those in need of a "[m]edical exemption, which is authorized for covered personnel for whom "immunization with [a] COVID-19 vaccine is detrimental to [their] health," at least until that detriment goes away. (SA 49; § 2.61(d)(1).) It's obvious that medical personnel who are exempt from the vaccine mandate for "health" reasons "*could* . . . present[] similar risks" of "spread[ing] COVID-19" as those with religious objections to the vaccine. *Tandon*, 141 S. Ct. at 1296 (emphasis added) (internal quotations omitted). And there is no reason of science or logic that mitigating accommodations provided for an individual with a medical exemption should be categorically unavailable for an individual in need of a religious exemption. Therefore, the DOH Rule plainly *and categorically* treats "comparable secular activity" (i.e., the practice of health care while unvaccinated for medical reasons) "more favorably than religious exercise" (i.e., the practice of health care while unvaccinated for religious reasons). *Id*. That is exactly the kind of disparate treatment that triggers strict scrutiny.

Defendants argue the medical exemption actually "*advances* the underlying rule's objective of protecting the health of healthcare workers and preventing them from becoming unavailable to work for medical reasons," and that denying an exemption in this situation "would exacerbate one of the very risks that DOH is attempting to address" and violate the principle of "do no harm." (App'nts Br. 44.)

On the contrary, as the District Court recognized, the DOH Rule is crystal clear that *all* unvaccinated healthcare workers have an "unacceptably high risk" of both contracting and spreading COVID to colleagues and vulnerable patients—a risk that obtains for an unvaccinated medical exemptee just as much as for a religious exemptee. Thus, a medical exemption "endangers these interests in a similar or greater degree than [a religious exemption] does." *Lukumi*, 508 U.S. at 543. Simply, Defendants cannot allow unvaccinated medical exemptees in order to retain more healthcare workers without undermining the policy's goal of avoiding exposure of more healthcare workers and patients to greater risks of getting COVID. Thus, even if Defendants' motives are to advance one goal of the DOH Rule (i.e., keeping workers) (a goal *even further* advanced by retaining religious exemptees), it's clear that an unvaccinated medical exemptee plainly "*could* . . .

present similar risks of spreading COVID-19" as a religious exemptee. *Tandon*, 141 S. Ct. at 1296 (cleaned up).[23]

This is nothing like the medical exemption in *Employment Division v. Smith*, because, as then-Judge Alito recognized, the exemption in *Smith* did "*not necessarily undermine Oregon's interest in curbing the unregulated use of dangerous drugs*." *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999) (Alito, J.) Here the medical exemption directly undercuts the DOH Rule's purpose of avoiding the "unacceptably high risk" of having unvaccinated healthcare workers around vulnerable patients and front-line providers.

As to Defendants' assertion that medical exemptions are necessary to avoid violating the "do no harm" principle, that simply amounts to a "value judgment that secular (i.e., medical) motivations for" forgoing the vaccine "are important enough to overcome its general interest" in avoiding COVID spread to vulnerable patients and front-line colleagues, "but that religious motivations are not." *Fraternal Order*, 170 F.3d at 366. The answer is not to force vaccination on a medically vulnerable healthcare worker, but rather to fire him or her alongside a religious objector, or exempt them both.

---

[23] Indeed, Defendants rightfully acknowledge that "the medical exemption may raise the risk of COVID-19 infection of and transmission from medically ineligible staff." (OB Br. 45).

The First Circuit committed similar errors in finding Maine's mandate to be generally applicable notwithstanding its allowance for medical exemptions. *Mills*, 2021 WL 4860328, at *6-*7. The Court found the mandate had "mutually reinforcing" triple interests: (1) protecting healthcare workers' health so they can serve patients; (2) protecting the health of the medically vulnerable—including healthcare workers who have medical contraindications to COVID vaccines; and (3) protecting the "health and safety of all Mainers." *Id*. at *6. It then said medical exemptions *advance* these goals by avoiding harm to medically needy workers' "own health and their ability to provide care." *Id*.

But the First Circuit is simply wrong. Although the Court cited the correct standards from recent Supreme Court cases requiring evaluation of whether exempted activity "pose[s] a similar risk" of spreading COVID, it summarily concluded that medical exemptions protect healthcare workers' "physical health" and thus advance the state's interest in protecting "the safety of all Mainers." *Id.* But the Court never evaluated whether protecting healthcare workers' "physical health" "*could* . . . present similar risks of spreading COVID-19" vis-a-vis religious exemptees. *Tandon*, 141 S. Ct. at 1296 (cleaned up). Indeed, the First Circuit earlier acknowledged that Maine adopted its mandate because it "faced a severe crisis in its healthcare facilities when the delta variant hit the state." *See Mills*, 2021 WL 4860328, at *3. So its failure to consider comparability of risks in

45

*spreading COVID* in healthcare settings was fatal to its analysis. Instead it simply endorsed an impermissible *value judgment* in favor of healthcare workers' "physical health" over religious needs—especially given that retaining religious exemptees would promote the same interest in serving patients' health (at the same risk of spreading COVID as medical exemptees). This Court should avoid the First Circuit's flawed analysis.

Defendants also argue that the DOH Rule's medical exemption has an "extremely narrow scope and limited duration" and thus does not pose *at least the same degree of harm* as religious exemptions.[24] (App'nts Br. 45.) Defendants argue that's because religious exemptions would allegedly be much greater in number and permanency given "our country's respect for diverse religious views, including individualized beliefs that may not reflect any institutionalized creed"—despite Governor Hochul's contemporaneous support for the DOH Rule's lack of religious exemptions because she is "not aware of a sanctioned religious exemption from any organized religion" (*see supra*)). (App'nts Br. 46.) Defendants say the

---

[24] Although DOH published an FAQ explaining that medical exemptions are limited only to those recognized by the CDC, (OB Br. n.11), the plain text of the actual rule is not so clear. The DOH Rule allows medical exemptions if COVID vaccination would be "detrimental to the health" of a covered worker, "based upon a pre-existing health condition," "in accordance with generally accepted medical standards"—"*for example*, the Recommendations of the Advisory Committee on Immunization Practices [ACIP] of the U.S. Department of Health and Human Services." (SA 49 (§ 2.61(d)(1).) Regardless, even assuming Defendants are correct, the DOH Rule still fails general applicability.

"preliminary data" shows that three to four times the number of healthcare workers have "claimed" religious exemptions as medical exemptions (id.), and that only 0.6% of hospital staff have qualified for medical exemptions, as have 0.5% of nursing home and adult care facilities workers. (id. 15.) But Defendants' analysis is fundamentally flawed.

First, even assuming arguendo that comparison of aggregate risks is appropriate at this stage, Plaintiffs' argument for religious equality in the DOH Rule would not require all healthcare facilities to grant all (or even Plaintiffs' own) requests for exemption based on sincerely held religious beliefs. It simply requires New York to *allow* covered employers to *consider* requests for reasonable religious accommodations for *covered* personnel (including Plaintiffs here) under Title VI. Thus Defendants can only speculate that religious exemptions in the aggregate would pose greater risk than medical exemptions when employers would remain free to deny religious exemptions on undue hardship grounds (if religious exemptions would truly pose an undue hardship).

Additionally, the question at the general applicability stage is whether medical exemptees pose the same or greater risk of spreading COVID as *these 17 Plaintiffs* in accord with their *individual* Free Exercise rights under the First Amendments. *See Brooklyn Diocese*, 141 S. Ct. at 67 (evaluating comparability of the particular religious claimants with their "admirable safety records" rather than

47

comparability of all New York City houses of worship with similar interests). Thus, the District Court was correct that the relevant question is whether New York accepts the "unacceptably high risk" of unvaccinated healthcare workers "for a *non-zero* segment" of those workers for medical reasons, because *that* is the activity which "could" pose a similar risk of spreading COVID vis-a-vis these Plaintiffs should they be *merely eligible* for a religious exemption. In other words, the government cannot accept an obvious undermining of its anti-COVID interests for *some* medical exemptees but for *zero potential* religious exemptees (including these 17 plaintiffs) without triggering strict scrutiny.

For all of these reasons, the DOH Rule is neither neutral nor general applicability and must undergo strict scrutiny—which it fails for the reasons discussed below.

### 4. The DOH Rule Easily Fails Strict Scrutiny.

To survive strict scrutiny, the DOH Rule must "advance[] interests of the highest order" and be "narrowly tailored to achieve those interests." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1881 (2001) (internal quotations omitted). Turning first to compelling interest, "a law cannot be regarded as protecting an interest 'of the highest order' when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 2234. And the asserted "compelling interest" cannot be stated at an unduly "high level of

generality," but rather must be a compelling interest "in denying an exception" to "*particular* religious claimants." *Fulton*, 141 S. Ct. at 1882.[25]

While "[s]temming the spread of COVID-19 is unquestionably a compelling interest," *Brooklyn Diocese*, 141 S. Ct. at 67, that is not the end of the inquiry. Here, there can be no compelling interest in denying *merely the opportunity* for a religious exemption for these 17 Plaintiffs, who are spread out across different healthcare facilities, when the DOH Rule allows the same institutions to grant medical exemptions notwithstanding the government's interest in stopping the spread of COVID and its Delta variant. Defendants can offer "no compelling reason why it has a particular interest in denying an exception [to these Plaintiffs] while making them available to others." *Fulton*, 141 S. Ct. at 1882; *see also id.* (Philadelphia's approval of secular exemptions from a non-discrimination rule "undermines the City's contention that its non-discrimination policies can brook no departure"). As the Supreme Court put it earlier this year, "[w]here the government permits other activities to proceed with precautions, it must *show* that the religious exercise at issue is *more dangerous* than those activities even when the same

---

[25]Defendants wrongly argue that the *particularized* compelling interest test requiring a compelling interest in "the omission of a religious exemption" is *not* a requirement of the Free Exercise Clause but is simply required under the Religious Freedom Restoration Act and the Religious Land Use and Institutionalized Persons Act. (OB Br. 56.) But as articulated above, *Fulton* was a Free Exercise case and it plainly adopted that standard. *Accord Wisconsin v. Yoder*, 406 U.S. 205, 221 (1972).

precautions are applied." *Tandon*, 141 S. Ct. at 1297 (emphasis added); *see also id.* 1296 (government "must do more than assert that certain risk factors are always present in worship, or always absent from other secular activities the government may allow) (internal quotes omitted). And this Court recently recognized New York's disparate occupancy limits on houses of worship violated the Free Exercise Clause when the government's "declarations did not purport to assess the transmission risk of religious worship based on any *data*." *Agudath Israel of Americal v. Cuomo*, 983 F.3d 620, 628 (2d Cir. 2020) (emphasis added). That is exactly what the government cannot do here—even in the aggregate, especially given the autonomy of healthcare employers in considering religious exemption requests—because healthcare work while unvaccinated is permitted for *medical* but not religious reasons.

Turning to narrow tailoring, here the government must "show[] that [the challenged rule] is the *least restrictive means*" of achieving a compelling interest." *Thomas v. Review Bd. of Indiana Emp. Security Div.*, 450 U.S 707, 718 (1981) (emphasis added).[26] As this Court has previously observed, that means "government must show it seriously undertook to address the problem with less intrusive tools readily available to it," and it "must *demonstrate* that alternative

---

[26] Defendants make the same erroneous argument about the "least restrictive means" test (OB Br. 56), but *Thomas* was a First Amendment case and is one of many that adopted that standard.

measures imposing lesser burdens on religious liberty would fail to achieve [its] interests." *Agudath Israel*, 983 F.3d at 633.

Accordingly, government must give "sufficient weight to rules in other jurisdictions," and "[i]t is the government's burden to show this alternative won't work; not the [claimant's] to show it will"). *Mast v. Fillmore Cnty., Minnesota*, 141 S. Ct. 2430, 2433 (2021) (Gorsuch, J., concurring and noting that the fact governments in other states allow for water-disposal alternatives of the kind sought by Amish plaintiffs in Minnesota undermined county's refusal to provide an accommodation there); *see also McCullen v. Coakley*, 573 U.S. 464, 495 (2014) (holding that state failed to "show[] that it considered different methods that other jurisdictions have found effective").

Here, the DOH Rule states that the Health Council considered two "Alternative Approaches": (1) requiring covered entities to "test all personnel in their facility before each shift" (but it found this to have little benefit and unreasonable costs), and (2) mandating all personnel to wear "fit-tested N95 face coverings at all times when in the facility" (but it found that fit-tested N95 coverings are not the only kind of "acceptable coverings" that have been "a long-standing requirement in these covered entities" and traditional face-coverings merely help *reduce*, but "do[] not prevent transmission"). (SA 39.)

51

But, as the District Court found, under strict scrutiny Defendants can provide "no adequate explanation" as to "why the 'reasonable accommodation' that must be extended to a medically exempt healthcare worker under § 2.61 could not similarly be extended to a healthcare worker with a sincere religious objection." (SA 31.) Further, Defendants have not actually *shown* that the precautions Plaintiffs took for the past 19 months necessarily contain more risk factors than if they were to perform their duties while vaccinated. *Tandon*, 141 S. Ct. at 1296.[27]

Plaintiffs are aware of only two other states in the entire country (Maine and Rhode Island) that similarly strip healthcare workers of their federal statutory and constitutional right to seek a religious exemption from a healthcare vaccine mandate. Even otherwise similar mandates imposed on healthcare workers in two of our country's most progressive states specifically authorize religious exemptions. *See* Illinois EO 2021-20 (COVID-19 EO No. 87) (Aug. 26, 2021) at Sec. 2(e) (*requiring* exemption where "vaccination is medically contraindicated" or where it "would require the individual to violate or forgo a sincerely held religious belief, practice, or observance");[28] California, State Public Health Officer Order of August 5, 2021, Sec. 2 ("Workers may be exempt . . . upon . . . [signing] a

---

[27] CNN Transcripts, Interview with CDC Director Dr. Rochelle Walensky, Aug. 5, 2021 (stating that "what [COVID vaccines] can't do anymore is prevent transmission" of the delta variant).

[28] https://www.illinois.gov/government/executive-orders/executive-order.executive-order-number-20.2021.html.

declination form . . . stating . . . the worker is declining vaccination based on Religious Beliefs").[29]

New York cannot show why similar alternatives cannot work for Plaintiffs here. *Accord Dahl v. Bd. of Trustees of W. Michigan Univ.*, No. 21-2945, 2021 WL 4618519, at *5 (6th Cir. Oct. 7, 2021) (holding that university's student-athlete vaccine mandate failed narrow tailoring in part where its conduct was "more severe" than "several other universities" which "grant exemptions from their COVID-19 [vaccine] mandates").

Defendants feebly argue they've satisfied narrow tailoring because there is allegedly a "very direct connection" between COVID vaccination and "the preservation of health and safety," and the rule applies only in "a discrete sector where COVID-19 transmission poses heightened unacceptable risks." (App'nts Br. 54.) At the same time it admits that "therapeutic options for COVID-19 remain experimental and are still being studied." (Id. 55 n.37.) Of course, the mere assertion of a connection to "the preservation of health and safety" generally is hardly *narrow* tailoring. And, in strict scrutiny world, applying the vaccination requirement only in the "discrete sector" of healthcare is a vice, not a virtue, because "[o]ne need not be a public health expert to recognize that the likelihood that a [healthcare worker] contracts COVID-19 from an unvaccinated non-

---

[29] https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Order-of-the-State-Public-Health-Officer-Health-Care-Worker-Vaccine-Requirement.aspx.

[healthcare worker] with whom she lives, studies, works, exercises, socializes, or dines may well meet or exceed that of the [healthcare worker] contracting the virus from a plaintiff who obtains a religious exemption to participate in [healthcare] activities." *Dahl*, 2021 WL 4618519, at *5 (finding same lack of narrow tailoring where university's student-athlete vaccine mandate did not apply to remainder of the student body).

Defendants also assert that the DOH Rule was necessary to increase the percentage of fully vaccinated staff at healthcare facilities. (App'nts Br. 56.) They also assert (and admit) that while masking and testing *do* reduce the risk of COVID-19 transmission and infection by unvaccinated workers, "they are *not as effective* as vaccination." (Id. 58.) But the Supreme Court has held that "the government does not have compelling interest in each marginal percentage point by which its goals are advanced," *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 803 n.9 (2011), so these claims fall flat under strict scrutiny.

Defendants further assert that DOH has an interest in *uniformity* across New York's healthcare system. (Id. 56.) But to the extent that interest is not strong enough to categorically foreclose medical exemptions, it is not strong enough, nor narrowly tailored, to categorically foreclose religious exemptions either.

Finally, Defendants note that then-Judge Gorsuch and the Tenth Circuit have recognized that courts *can* look for "a qualitative or quantitative difference

between the particular religious exemption requested and other secular exceptions already tolerated." *Yellowbear v. Lampert*, 741 F.3d 48, 61 (10th Cir. 2014) (Gorsuch, J.). Defendants' bizarre argument that our "country's respect for diverse religious views" actually requires *denying* Plaintiffs' quest for a religious exemption (App'nts Br. 46) here reemerges in the analysis. But it, too, falls flat. As then-Judge Gorsuch recognized, the point of looking for differences between secular and religious exemptions is to determine whether a secular exemption actually undermines the government's interest and thus renders it truly underinclusive, or whether it "bespeak[s] neither a shaky commitment to the asserted compelling interest nor any discriminatory intent." *See Yellowbear*, 741 F.3d at 61.

But as the District Court correctly found, the very premise of the DOH Rule is that *any* unvaccinated healthcare worker poses an "unacceptably high risk" of spreading and contracting COVID in a healthcare setting, and yet it *accepts* that risk for healthcare workers who qualify for medical exemptions. (SA 29). As already noted, Plaintiffs cannot *demonstrate*, rather than merely assert, that the number of religious exemptions will actually vastly outnumber medical exemptions when Plaintiffs' First Amendment argument merely requires New York to give Plaintiffs' employers the *opportunity* to consider their requests for religious exemption. The fact Defendants have no evidence that Title VII-

consistent religious exemptions allowed in other jurisdictions are upending the healthcare systems there only validates this point.

In sum, the DOH Rule is not narrowly tailored in furtherance of a particularized compelling interest and thus fails strict scrutiny. Plaintiffs are thus also likely to succeed on the merits of their Free Exercise claim.

## II. THE DISTRICT COURT PROPERLY HELD THE REMAINING FACTORS FAVOR A PRELIMINARY INJUNCTION.

### A. Irreparable Harm

"[A]n alleged constitutional infringement will often alone constitute irreparable harm." *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011). The Second Circuit has plainly recognized this includes a violation of the Supremacy Clause. *See Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 155 (2d Cir. 2016) ("Because plaintiffs are thus likely to succeed on their preemption claim, they are entitled to a preliminary injunction."); *see also U.S. v. State of N.Y.*, 708 F.2d 92 (2d Cir. 1983) (upholding district court finding of irreparable harm for preemption claim). And, of course, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Because Plaintiffs are likely to succeed on the merits of both their preemption and First Amendment claims, they have unquestionably suffered irreparable harm, as the District Court properly held. (SA 34.)

56

Defendants argue Plaintiffs primarily assert potential adverse employment actions (App'nts Br. 67), but that overlooks the primary *constitutional harms* outlined above. And while Plaintiffs do not assert that mere loss of employment is per se irreparable, in this case employment termination cannot be remedied by money damages because employers would be protected by the DOH Rule in denying all religious exemption requests and the State is immune to damages under the Eleventh Amendment. *See State of N.Y.*, 708 F.2d at 94 (noting the district court appropriately found irreparable harm where plaintiff's "federal damages against New York are constitutionally foreclosed" under the Eleventh Amendment).[30]

Defendants further argue that Plaintiffs have not shown likely adverse consequence to their licensure status because they have not shown the State Education Department, which regulates their licensure, has taken any relevant action—but Plaintiffs explained they will need to report any involuntary

---

[30] Defendants bewilderingly argue that the DOH Rule "does not require private employers to terminate or otherwise take adverse employment actions against unvaccinated healthcare workers." (OB Br. 68.) But the rule is clear that covered entities "*shall continuously require* personnel to be fully vaccinated against COVID-19," except for approved medical exemptions. (SA 38.) Plaintiffs are curious indeed to know whether New York is not *actually* enforcing this rule (as enforcement would obviously *require* employers *to fire workers who choose not to vaccinate*) (recall that covered "personnel" already does not include telemedicine workers, § 2.61(a)(2)). Such lack of enforcement would shed significant light on whether the DOH Rule's underlying interest is *actually compelling* and likely reveal that the policy contains a mechanism of de facto *individualized exemptions*. *See Dahl*, 2021 WL 4618519, at *3.

employment termination and loss of admitting privileges on licensure renewal statements in this and/or in other jurisdictions. (E.g., V. Cmplt. ¶¶43, 53, 63.) For the same reason, Defendants' argument that Plaintiffs have shown no impending harm to their professional or even employment status—including no actual threats of employment loss—is manifestly untrue. (E.g., V. Cmplt. ¶68 (describing September 7th memo from Nurse D.'s management that failure to vaccinate by September 28th *will* result in "voluntary" termination); ¶156 (describing Dr. P.'s September 7th meeting with the OB/GYN department chair who stated that "disregarding NYS Vaccination Mandate may affect your ability to continue working and training with your residency or fellowship program"); ¶174 (Dr. S notified on September 1st by hospital administration that failure to provide proof of vaccination by September 21st *will* result in hospital privileges being suspended).)

Defendants also argue for the first time on appeal that the DOH Rule *does not actually burden* Plaintiffs' religious exercise because they "remain free to refuse a COVID-19 vaccine" by simply giving up their current employment, and they can always be fully compensated later (but *see supra* explaining why that isn't true). (App'nts Br. 70.) Besides having waived that argument by not raising it below, the First Amendment has recognized the pressure of even a $5 fine (in 1972 dollars) for not complying with a religion-burdening mandate as sufficiently

coercive to burden an individual's Free Exercise rights. *See Wisconsin v. Yoder*, 406 U.S. 205, 208 (1972). Here, the pressure of jeopardizing, say, Nurse D.'s ability to pay back more than $50,000 in loans from her nursing program simply for exercising her religious objection to COVID vaccination easily qualifies as a sufficient burden on First Amendment rights, triggering irreparable harm.

Defendants' additional contention that Plaintiffs are not actually "barred" from "pursu[ing] their calling" is just as feeble. (App'nts Br. 70.) The DOH Rule literally prohibits Plaintiffs from working in healthcare in New York unless they undergo COVID vaccination against their sincerely held religious beliefs. To say this "bears no resemblance to" the harm at issue in *Brooklyn Diocese* is absurd, because under Defendants' logic, New York worshippers could have simply fled the City to a more sane jurisdiction that didn't treat worship as a second-class activity. But under *Brooklyn Diocese*'s winning logic, worshippers were entirely prohibited from worshipping according to their religious beliefs anywhere in the New York City, just as Plaintiffs here are entirely prohibited from pursuing their calling to care for the sick and most vulnerable while exercising their faith anywhere in New York, "thus directly inhibiting religious practice." (Id.) Plaintiffs have thus easily established irreparable harm.

###    B.    Public Interest and Balance of Hardships

This Court has previously found that a preliminary injunction enjoining local laws preempted by the Supremacy Clause is in the public interest and outweighs any hardship to the government. *See Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 155 (2d Cir. 2016). Additionally, this Court has held that "securing First Amendment rights is in the public interest." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Thus, the District Court's preliminary injunction is squarely in the public's interest here.

As to the balance of hardships, Plaintiffs merely seek an injunction that "appropriately permits"—but does not even *require*—"religious [conduct] with the same risk-minimizing precautions as similar activities" allowed healthcare workers with medical exemptions. *See Roberts*, 958 F.3d at 416 (6th Cir. 2020). And Defendants have not shown that granting the same accommodations to Plaintiffs for religious reasons would impose any more harm—especially when Plaintiffs have been on the front lines of stopping COVID for the past 19 months while donning PPE and exercising other proper protocols in effectively slowing the spread of the disease, even *after* COVID vaccines were introduced early this year, and even since the Delta variant appeared.

Defendants argue that grave general public interests are at stake. But they merely observe that it's very important to protect vulnerable patients, an observation with which Plaintiffs wholeheartedly agree. They also say the vaccine

60

requirement will prevent staffing shortages and thus protect non-COVID patients in need of emergency assistance. (App'nts Br. 71.) But the DOH Rule's omission of any religious exemption has been enjoined statewide for over a month now (i.e., since September 14, 2021) (SA 1-5), and Defendants have not brought forth a scintilla of evidence showing any harm to public health as a result.

Additionally, reversing the District Court's injunction will likely result in the near-immediate termination of at least several Plaintiffs here, along with 229 healthcare workers across St. Peter's Health system (*see supra*, n. 9), and surely many other healthcare workers, in addition**. Such a large and immediate loss of healthcare staffing will only exacerbate the worker shortages that Defendants seek to avoid**, especially as respiratory illness season arrives with colder weather. All this while Defendants admit that "testing and masking . . . reduce the risk of COVID-19 transmission and infection by unvaccinated workers." (App'nts Br. 58.)

All told, the District Court's preliminary injunction preserves Plaintiffs' constitutional rights, restores equal treatment for medical and religious exemptees, and allows additional healthcare workers to continue serving needy patients without any evidence they are harming public health. The equitable factors thus weigh strongly in favor of affirming the District Court's preliminary injunction.

## **<u>CONCLUSION</u>**

For the foregoing reasons, this Court should AFFIRM the District Court's

preliminary injunction.

Respectfully submitted,


/s/ Christopher Ferrara
CHRISTOPHER A. FERRARA, ESQ.
Special Counsel
THOMAS MORE SOCIETY
148-29 Cross Island Parkway
Whitestone, Queens, New York 11357
Telephone: (718) 357-1040
cferrara@thomasmoresociety.org
*Counsel for Plaintiffs*

/s/ Michael McHale
MICHAEL G. MCHALE
Counsel
THOMAS MORE SOCIETY
10506 Burt Circle, Ste. 110
Omaha, NE 68114
402-501-8586
*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Christopher Ferrara, attorney for the Thomas More Society, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 13,980 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.


/s/ Christopher Ferrara