# 21-2566

## United States Court of Appeals
## for the Second Circuit

Dr. A., Nurse A., Dr. C., Nurse D., Dr. F., Dr. G., Therapist I.,
Dr. J., Nurse J., Dr. M., Nurse N., Dr. O., Dr. P., Technologist P.,
Dr. S., Nurse S., Physician Liaison X.,

*Plaintiffs-Appellees,*

v.

Kathy Hochul, Governor of the State of New York, in her official capacity,
Dr. Howard A. Zucker, Commissioner of the New York State Department
of Health, in his official capacity, Letitia James, Attorney General of the
State of New York, in her official capacity,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of New York

## REPLY BRIEF FOR APPELLANTS

Barbara D. Underwood
  *Solicitor General*
Steven C. Wu
  *Deputy Solicitor General*
Mark S. Grube
  *Assistant Solicitor General*
  *of Counsel*

Letitia James
  *Attorney General*
  *State of New York*
Attorney for Appellants
28 Liberty Street
New York, New York 10005
(212) 416-8028

Dated: October 25, 2021

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................ii

PRELIMINARY STATEMENT ............................................................ 1

ARGUMENT .................................................................................... 3

POINT I

PLAINTIFFS HAVE NOT ESTABLISHED A LIKELIHOOD OF SUCCESS
ON THE MERITS.............................................................................. 3

    A.   DOH's Emergency Rule Comports with the Free
        Exercise Clause. .................................................................. 4

        1.   DOH's emergency rule is subject to rational-basis
            review................................................................... 4

            a.   DOH's emergency rule is neutral.............................. 4

            b.   DOH's emergency rule is generally applicable. ......... 9

        2.   DOH's emergency rule has a rational basis and
            would survive heightened scrutiny in any event. ........... 15

    B.   DOH's Emergency Rule Is Not Preempted by Title VII. ....... 22

POINT II

THE BALANCE OF THE EQUITIES TIPS DECIDEDLY IN FAVOR OF
DENYING A PRELIMINARY INJUNCTION HERE........................................ 31

CONCLUSION ................................................................................ 36

i

# TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*Beckerich v. St. Elizabeth Med. Ctr.*,
No. 21-cv-105, 2021 WL 4398027 (E.D. Ky. Sept. 24, 2021) ............. 34

*Boone v. Boozman*,
217 F. Supp. 2d 938 (E.D. Ark. 2002) ................................................... 3

*Brown v. F.L. Roberts & Co.*,
419 F. Supp. 2d 7 (D. Mass. 2006) ...................................................... 22

*Burlington N. R. v. Nebraska*,
802 F.2d 994 (8th Cir. 1986) .............................................................. 21

*C.F. v. New York City Dep't of Health & Mental Hygiene*,
191 A.D.3d 52 (2d Dep't 2020) ............................................................. 3

*California Fed. Sav. & Loan Ass'n v. Guerra*,
479 U.S. 272 (1987) .......................................................................... 27

*Central Rabbinical Cong. v. New York City Dep't of Health &
Mental Hygiene*,
763 F.3d 183 (2d Cir. 2014) ............................................................... 10

*Chevron U.S.A. Inc. v. Echazabal*,
536 U.S. 73 (2002) ............................................................................ 28

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) .......................................................................... 14

*Cosme v. Henderson*,
287 F.3d 152 (2d Cir. 2002) ............................................................... 24

*Does v. Mills*,
No. 21-1826, 2021 WL 4860328 (1st Cir. Oct. 19, 2021) ............ passim

*Dr. T. v. Alexander-Scott*,
No. 21-cv-387, 2021 WL 4476784 (D.R.I. Sept. 30, 2021) ............. 4, 21

*Draper v. United States Pipe & Foundry Co.*,
527 F.2d 515 (6th Cir. 1975) ......................................................... 28, 29

## Cases                                                                      Page(s)

*Employment Div., Dep't of Human Res. of Ore. v. Smith,*
    494 U.S. 872 (1990)..........................................................................4, 14

*Endres v. Indiana State Police,*
    349 F.3d 922 (7th Cir. 2003)............................................................25

*F.F. v. State,*
    194 A.D.3d 80 (3d Dep't 2021).......................................................3, 7

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2021).........................................................................8

*Gulino v. New York State Educ. Dep't,*
    460 F.3d 361 (2d Cir. 2006).........................................................23, 33

*Hamilton v. City of New York,*
    No. 18-cv-4657, 2021 WL 4439974 (E.D.N.Y. Sept. 28, 2021)...........26

*Harsman v. Cincinnati Children's Hosp. Med. Ctr.,*
    No. 21-cv-597, 2021 WL 4504245 (S.D. Ohio Sept. 30, 2021)............32

*Hillsborough Cnty. v. Automated Med. Lab's, Inc.,*
    471 U.S. 707 (1985)..........................................................................29

*Hyde v. KLS Pro. Advisors Grp., LLC,*
    500 F. App'x 24 (2d Cir. 2012).........................................................31

*Inmates of Attica Corr. Facility v. Rockefeller,*
    453 F.2d 12 (2d Cir. 1971)................................................................33

*Jackson v. I.R.S.,*
    No. 97-0365-J, 1997 WL 375365 (S.D. Cal. Mar. 17, 1997)..............33

*Jacobson v. Massachusetts,*
    197 U.S. 11 (1905)................................................................................3

*Kalsi v. New York City Tr. Auth.,*
    62 F. Supp. 2d 745 (E.D.N.Y. 1998)................................................25

*Kentucky v. Beshear,*
    981 F.3d 505 (6th Cir. 2020)............................................................20

**Cases**                                                                **Page(s)**

*Kheriaty v. Regents of Univ. of Cal.*,
No. 21-cv-1367, 2021 WL 4714664 (C.D. Cal. Sept. 29, 2021) .......... 34

*Matter of Civil Serv. Emps. Ass'n v. New York State (Unified Ct. Sys.)*,
Index No. 908328-21, 2021 WL 4929983
(Sup. Ct. Albany County Oct. 15, 2021) ............................................ 34

*New Hope Fam. Servs., Inc. v. Poole*,
966 F.3d 145 (2d Cir. 2020) ................................................................ 5

*New State Ice Co. v. Liebmann*,
285 U.S. 262 (1932) ........................................................................... 20

*Nikolao v. Lyon*,
875 F.3d 310 (6th Cir. 2017) ................................................................ 3

*Norris v. Stanley*,
No. 21-cv-756, 2021 WL 4738827 (W.D. Mich. Oct. 8, 2021) ............. 34

*Phillips v. City of New York*,
775 F.3d 538 (2d Cir. 2015) ................................................................. 3

*Regeneron Pharm., Inc. v. United States Dep't of Health &*
*Human Servs.*,
510 F. Supp. 3d 29 (S.D.N.Y. 2020) .................................................... 33

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
141 S. Ct. 63 (2020) ..................................................................... 8, 17

*Sampson v. Murray*,
415 U.S. 61 (1974) ............................................................................. 31

*Savage v. Gorski*,
850 F.2d 64 (2d Cir. 1988) ................................................................. 31

*Sides v. New York State Div. of State Police*,
No. 03-cv-153, 2005 WL 1523557 (N.D.N.Y. June 28, 2005) ............. 26

*Trans World Airlines, Inc. v. Hardison*,
432 U.S. 63 (1977) ....................................................................... 24, 25

iv

**Cases**                                                           **Page(s)**

*Travis v. Pennyrile Rural Elec. Co-op.*,
399 F.2d 726 (6th Cir. 1968)................................................. 33

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
137 S. Ct. 2012 (2017)......................................................... 7

*United States v. New York*,
708 F.2d 92 (2d Cir. 1983) .................................................. 32

*Virginia Office for Prot. & Advocacy v. Stewart*,
563 U.S. 247 (2011)............................................................ 32

*W.D. v. Rockland Cnty.*,
521 F. Supp. 3d 358 (S.D.N.Y. 2021) .................................... 3

*Wisconsin v. Yoder*,
406 U.S. 205 (1972)............................................................ 33

*Workman v. Mingo Cnty. Bd. of Educ.*,
419 F. App'x 348 (4th Cir. 2011) .......................................... 3

*Wright v. DeWitt Sch. Dist. No. 1*,
238 Ark. 906 (1965)............................................................ 3

*Zucht v. King*,
260 U.S. 174 (1922)............................................................ 3

## Laws and Regulation

42 U.S.C.
§ 2000e ............................................................... 28, 29
§ 2000e-5 ................................................................. 32
§ 2000e-7 ................................................................. 30

10 N.Y.C.R.R. § 2.61 ............................................................ 23

## PRELIMINARY STATEMENT

Defendants' opening brief demonstrated that plaintiffs have failed to satisfy the strict requirements for the extraordinary and drastic remedy of a statewide preliminary injunction against the enforcement of the Department of Health's (DOH) emergency rule requiring COVID-19 vaccination for healthcare workers. Just last week, the First Circuit confirmed defendants' arguments by rejecting Free Exercise and Title VII claims against a Maine regulation similarly requiring that healthcare workers receive a COVID-19 vaccination without a religious exemption. *See Does v. Mills*, No. 21-1826, 2021 WL 4860328, at *1 (1st Cir. Oct. 19, 2021).[1]

Plaintiffs' arguments to the contrary are meritless. On plaintiffs' Free Exercise claim, their contention that the emergency rule is not neutral falls flat in the absence of any evidence of religious hostility by the DOH officials who considered and promulgated the rule, and on the fact that the emergency rule treats all medically eligible healthcare

---

[1] Plaintiffs in *Mills* have filed in the Supreme Court an emergency application for injunctive relief pending disposition of their petition for a writ of certiorari. Justice Breyer has ordered a response from Maine by noon on October 25, 2021. *See Does v. Mills*, No. 21A90 (U.S. Oct. 20, 2021).

workers the same, rather than singling out religious beliefs for special disfavor. Plaintiffs' argument that the presence of a limited medical exemption renders the emergency rule not generally applicable also fails because it ignores the tightly constrained nature of that exemption and its consistency with the emergency rule's underlying objectives of protecting the health of healthcare workers and preventing staffing shortages. Finally, plaintiffs' assertion that the emergency rule is not necessary fails under any level of scrutiny given the unique vulnerabilities of the healthcare sector and the emergency rule's careful tailoring to discrete categories of workers at certain facilities where the risk of COVID-19 is particularly acute.

Plaintiffs' claim of Title VII preemption is also meritless. Plaintiffs' principal argument on appeal is that the emergency rule forbids accommodations that Title VII requires. But the emergency rule does not prevent employers from reassigning unvaccinated workers to activities that would remove them from the scope of the rule. And plaintiffs' claim that some employers may *want* to allow unvaccinated workers to continue interacting with others—even if true—is immaterial to the preemption claim because Title VII does not *require* such accommodations.

## ARGUMENT

## POINT I

### PLAINTIFFS HAVE NOT ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS

As defendants demonstrated in their opening brief, courts have long upheld mandatory vaccination laws, including those without religious exemptions, as valid exercises of the States' police powers.[2] See Appellants' Br. at 31-33. Indeed, plaintiffs agree that this Court's express acknowledgement that a religious exemption from a school vaccine mandate "goes beyond what the Constitution requires," *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015), is "hardly surprising" given controlling Supreme Court precedents. Br. for Pls.-Appellees (Br.) at 22-23. On the basis of the same precedents, the First Circuit recently affirmed the

---

[2] *See, e.g.*, *Jacobson v. Massachusetts*, 197 U.S. 11, 25-27 (1905); *Zucht v. King*, 260 U.S. 174, 176 (1922); *Nikolao v. Lyon*, 875 F.3d 310, 316 (6th Cir. 2017) (Michigan's religious exemption not constitutionally required); *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015); *Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. App'x 348, 353-54 (4th Cir. 2011); *W.D. v. Rockland Cnty.*, 521 F. Supp. 3d 358, 396-409 (S.D.N.Y. 2021); *Boone v. Boozman*, 217 F. Supp. 2d 938, 954 (E.D. Ark. 2002); *F.F. v. State*, 194 A.D.3d 80, 88 (3d Dep't), *appeal dismissed & lv. denied*, 2021 N.Y. Slip Op. 72937 (N.Y. 2021); *C.F. v. New York City Dep't of Health & Mental Hygiene*, 191 A.D.3d 52, 71-78 (2d Dep't 2020); *Wright v. DeWitt Sch. Dist. No. 1*, 238 Ark. 906, 913 (1965).

denial of a preliminary injunction against Maine's COVID-19 vaccination requirement for healthcare workers, which, like the emergency rule, does not contain a religious exemption. *Mills*, 2021 WL 4860328, at *1. And a district court in Rhode Island denied a TRO against a similar requirement. *See Dr. T. v. Alexander-Scott*, No. 21-cv-387, 2021 WL 4476784 (D.R.I. Sept. 30, 2021). Here too, plaintiffs have failed to show any likelihood of success on the merits of their claims.

## A. DOH's Emergency Rule Comports with the Free Exercise Clause.

### 1. DOH's emergency rule is subject to rational-basis review.

As shown in defendants' opening brief, DOH's emergency rule is subject to rational-basis review because it is a "neutral law of general applicability." *Employment Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 879 (1990) (quotation marks omitted). See Appellants' Br. at 35-51.

#### a. DOH's emergency rule is neutral.

Plaintiffs do not dispute (Br. at 37) that the emergency rule is facially neutral. *See Mills*, 2021 WL 4860328, at *5. They nonetheless

4

identify two other reasons to support their assertion that the emergency rule operates in practice to target religion. Neither has merit.

*First*, plaintiffs assert that the emergency rule "specifically excis[ed] the prior religious exemption" contained in the DOH Commissioner's Order for Summary Action (Br. at 37-38 (emphasis omitted)), and that this change necessarily triggers strict scrutiny. But plaintiffs identify no evidence whatsoever to support the inference that the changes from the Commissioner's Order to the emergency rule reflected any "hostility toward certain religious beliefs," *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 160 (2d Cir. 2020). To the contrary, as DOH explained at the August 26, 2021, meeting, the model for the emergency rule was DOH's vaccination requirements for measles and rubella, which also include no religious exemption; those decades-old requirements are thus the relevant history for this emergency rule, not the Order for Summary Action. See Appellants' Br. at 18-19.

As defendants have explained (*id.* at 11-12, 38-39), the Order for Summary Action was never intended to establish a baseline against which all further rulemaking in this area should be measured. Instead, the Order was issued by the Commissioner under his sole authority as

5

an immediate and temporary and relatively narrow stop-gap measure, pending the Public Health and Health Planning Council's separate and more deliberate consideration of the emergency rule's broader and longer-term policy. The Council's role was not to review the Commissioner's order, but rather to make a fresh determination under its independent authority with the benefit of additional information. Unlike the Commissioner, the Council was informed by more comprehensive input from the Council's two dozen other members. And unlike the Commissioner, the Council had the benefit of the new information that the FDA had granted full regulatory approval to the Pfizer vaccine on August 23, 2021. (J.A. 358-362.) Nothing about the Council's independent rulemaking suggests that the Council was amending the Commissioner's Order at all, let alone doing so on the basis of religious hostility.[3]

---

[3] Plaintiffs' reliance on the First Circuit's discussion of the procedural history of DOH's emergency rule is misplaced. Br. at 41. The First Circuit, which did not have the full record of this appeal before it, misapprehended that history. For example, the First Circuit stated that "New York officials promulgated a version of the regulation containing a religious exemption, [and then] amended the regulation to eliminate the religious exemption." *Mills*, 2021 WL 4860328, at *9 (quotation marks omitted). But the Council did not "amend" a prior regulation, but rather engaged in a distinct regulatory process with distinct decisionmakers to enact a new regulation with different duration and scope.

6

More fundamentally, even if DOH's emergency rule could be characterized as "removing" a prior religious exemption, plaintiffs are wrong to suggest (at 34, 37-38) that such a change is necessarily non-neutral—and thus subject to heightened scrutiny—under the Free Exercise Clause. When the removal of a religious exemption restores equality, rather than subjecting religious beliefs to distinctive burdens, such a change does not "single out the religious for disfavored treatment," *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2020 (2017). Here, the emergency rule treats religious exemptions *the same* as any other type of exemption—with the sole exception of the narrow medical exemption, which is unique for reasons explained in defendants' opening brief (Appellants' Br. at 44-49) and further below (*infra* at 12-13). In comparable circumstances—i.e., when "the elimination of the [religious] exemption subjects those in the previously covered class to vaccine rules that are generally applicable to the public," *F.F. v. State*, 194 A.D.3d 80, 83, 88 (3d Dep't), *appeal dismissed & lv. denied*, 2021 N.Y. Slip Op. 72937 (N.Y. 2021)—courts have declined to apply heightened scrutiny even when an agency or legislature has deliberately

7

eliminated longstanding religious exemptions. *See Mills*, 2021 WL 4860328, at *1.

*Second*, plaintiffs argue for the first time on appeal (at 10-11, 39-40) that statements by Governor Hochul—made nearly three weeks *after* the issuance of the emergency rule here—reflect animus towards religion and a lack of neutrality. As a threshold matter, these statements were not a basis for the preliminary injunction and are not properly raised on appeal. But even if they could be considered, they do not present circumstances that would plausibly suggest that religious animus motivated DOH's emergency rule.

For one thing, plaintiffs have identified no statements demonstrating "intoleran[ce] of religious beliefs" by the DOH officials or Council members who actually considered and promulgated this emergency rule. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021). By contrast, the statements that troubled this Court in *New Hope Family Services* and the Supreme Court in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020), were made by the same officials who were responsible for the policies under review.

8

In any event, assuming that those statements bear on DOH's issuance of the emergency rule at all, they do not show any departure from neutrality towards religion. Instead, Governor Hochul's statements reflected an attempt to speak positively about religion by arguing that accepting the COVID-19 vaccine was consistent with her Christian faith and that vaccination was consistent with religious principles—the same message that many faith leaders have also propounded. See Appellants' Br. at 10-11. Her statements are thus not remotely comparable to the statements that courts described as criticizing disfavored religions or religious views in *Roman Catholic Diocese* and *New Hope Family Services*.

### b. DOH's emergency rule is generally applicable.

The emergency rule is also generally applicable. The First Circuit reached the same conclusion about Maine's vaccination requirement for healthcare workers, holding that it was not underinclusive because it

"applies to all healthcare workers for whom a vaccine is not medically contraindicated." *Mills*, 2021 WL 4860328, at *8.[4]

Contrary to plaintiffs' arguments (at 41-44), the presence of a medical exemption does not require a religious exemption. As defendants have shown, the medical exemption is not "at least as harmful" to DOH's objectives as a religious exemption would be, for at least two reasons. *See Central Rabbinical Cong. v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014); *see also Mills*, 2021 WL 4860328, at *5 ("[N]o case of the Supreme Court holds that a single objective exemption renders a rule not generally applicable.").

*First*, the medical exemption furthers rather than undermines one of the emergency rule's key underlying policies: "ensuring that healthcare workers remain healthy and able to provide the needed care to an overburdened healthcare system." *Mills*, 2021 WL 4860328, at *6. By contrast, vaccinating workers who have medical contraindications would

---

[4] Plaintiffs do not argue that DOH's emergency rule is subject to strict scrutiny under the alternative test for general applicability for regulatory schemes that vest a government official or agency with broad discretion to grant individualized exemptions. See Appellants' Br. at 50-51. They have accordingly waived any such argument.

"compromise both their own health and their ability to provide care." *Id.* For these reasons, the First Circuit found that a medical exemption from a vaccination requirement was "meaningfully different from exemptions to other COVID-19-related restrictions" that the Supreme Court considered in *Roman Catholic Diocese* and its progeny. *Id.*

*Second*, the emergency rule's medical exemption is significantly narrower in scope and duration than plaintiffs' proposed religious exemption would be, as defendants have explained. See Appellants' Br. at 44-49. Plaintiffs do not appear to contest the limited duration of medical exemptions. Instead, they argue (at 47) only that the overall numbers of religious exemptions remain speculative. But many of the figures cited by defendants come from recent data reported by healthcare facilities that were actually granting religious exemptions to the emergency rule due to the temporary restraining orders from this Court and the court below. See Appellants' Br. at 20-23. Defendants also cited the actual experience of other jurisdictions that have offered religious exemptions from COVID-19 vaccination requirements. *Id.* at 22-23. Plaintiffs, who bear the burden of establishing equitable relief, offer nothing to dispute those figures.

11

Moreover, since defendants filed their opening brief, DOH has reported new figures confirming the broader scope of any religious exemption, according to self-reported data from facilities. As of October 19, 2021, 127,822 of 144,183 workers at nursing homes were fully vaccinated (88.7%), with an additional 12,569 (8.7) having received one dose of a two-dose vaccine (12.1%). Only 538 nursing-home workers were reported as currently medically ineligible for a COVID-19 vaccine (0.4%). Another 2,680 were reported as "other" exemptions (1.9%), which DOH understands to refer to the religious exemption preserved by the various temporary restraining orders.[5]

As of the same date, 26,449 of 29,583 workers at adult care facilities were fully vaccinated (89.4%), with an additional 2,166 having received one dose of a two-dose vaccine (7.3%). Only 155 adult-care facility workers were reported as currently medically ineligible for a COVID-19 vaccine (0.5%). Another 567 were reported as "other" (religious) exemptions (1.9%).[6]

---

[5] *See* Decl. of Valerie A. Deetz ¶ 3, *Serafin v. New York State Dep't of Health*, Index No. 908296-21 (Sup. Ct. Albany County Oct. 20, 2021), NYSCEF Doc. No. 56.

[6] *See id.* ¶ 4.

Also as of the same date, 91.4% of hospital workers were fully vaccinated, with an additional 4.8% having received one dose of a two-dose vaccine. Only 0.5% of hospital workers were medically ineligible for a COVID-19 vaccine at that time. Another 1.3% of staff were reported as "other" (religious) exemptions.[7]

The disparity between medical and religious exemptions is not uniform across the State. *See Mills*, 2021 WL 4860328, at *2 (noting disparities in "geographic distribution of vaccination" within Maine). In Erie County, only 41 hospital workers (0.2%) were currently medically ineligible, while 740 (4%) (18 times as many) reported "other" (religious) exemptions. And in Monroe County, only 42 (0.1%) of hospital workers were currently medically ineligible, while 977 (3.2%) (23 times as many) reported "other" (religious) exemptions.[8]

Plaintiffs also argue (at 47) that the "general applicability" of DOH's emergency rule should be assessed by whether a religious exemption for "*these 17 plaintiffs*" would cause comparable harm to a

---

[7] *See* Decl. of Dorothy Persico ¶ 3, *Serafin*, Index No. 908296-21 (Sup. Ct. Albany County Oct. 21, 2021), NYSCEF Doc. No. 57.

[8] *See id*. ¶¶ 4-5.

medical exemption. That argument makes no sense. For one thing, plaintiffs sought and received a statewide injunction, not one limited to these seventeen plaintiffs. More fundamentally, the test for general applicability (as its name suggests) looks at the overall scope of a challenged policy to determine whether it is substantially underinclusive at achieving its stated objectives. *See, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543-46 (1993). The question is thus not whether DOH could safely allow these individual plaintiffs to remain unvaccinated—just as, in *Smith*, it would have been immaterial whether the two individual plaintiffs could have been safely exempted from Oregon's controlled-substance law. *See* 494 U.S. at 878-79. Rather, the question is whether DOH's emergency rule "impose[s] burdens only on conduct motivated by religious belief," *Lukumi*, 508 U.S. at 543, or instead treats claims for religious exemption the same as other comparable exemption claims. That inquiry necessarily looks beyond the facts of these individual plaintiffs.

**2.    DOH's emergency rule has a rational basis and would survive heightened scrutiny in any event.**

Although plaintiffs make the conclusory assertion that the emergency rule is irrational (at 14-15), they do not develop that argument. Nor could they plausibly do so. DOH acted rationally in protecting public health and safety in particularly vulnerable facilities by vaccinating healthcare workers whose responsibilities require them to directly interact with patients, residents, and other personnel. The emergency rule protects the health of the workers themselves, and also prevents them from being vectors of transmission to their colleagues and the vulnerable populations that they serve. See Appellants' Br. at 52-53. These protections have the further benefit of preventing (a) staffing shortages that could follow an outbreak among staff, and (b) strains on limited healthcare resources that could follow an outbreak among patients or residents. Further, as the Greater New York Hospital Association (GNYHA) has observed, the vaccination requirement "has the potential to mitigate the severe psychological distress and burnout plaguing personnel on the front lines of the pandemic" by limiting the strains that the healthcare sector faced when no vaccination was available. Br. for Amicus Curiae Greater N.Y. Hosp. Ass'n in Supp. of

Defs.-Appellees at 5, ECF No. 124 (GNYHA Br.); *see id.* at 16-21. And the emergency rule reduces the harms that would result from members of the public deferring urgent care due to the fear of contracting COVID-19 from healthcare workers. *See id.* at 15.

The First Circuit concluded that Maine's rule was rational for many of these reasons. It noted that "the delta variant is more than twice as contagious as previous variants," and that an infected individual "may transmit it to others within twenty-four to thirty-six hours of exposure." *Mills*, 2021 WL 4860328, at *3. As a result of the spread of the Delta variant, Maine saw "a 300% increase in COVID-19 cases between June 19 and July 23." *Id.* The First Circuit also noted that the healthcare sector is "uniquely susceptible to outbreaks of infectious diseases like COVID-19 because medical diagnosis and treatment often require close contact between providers and patients (who are often medically vulnerable)," and such outbreaks "hamper the state's ability to care for its residents suffering both from COVID-19 and from other conditions." *Id.*

In any event, defendants have also shown why the emergency rule would withstand heightened scrutiny as well. The rule's goal of prevent-

ing the spread of COVID-19 is "unquestionably a compelling interest."[9]

*Roman Catholic Diocese*, 141 S. Ct. at 67. Moreover, the rule is narrowly

tailored to achieve that end. Vaccinations are the *most* effective method

of reducing the spread of (and complications from) COVID-19 in

healthcare settings. Vaccination "reduces the likelihood of symptomatic

or asymptomatic COVID-19 infection by up to 90%," and the "risk of

hospitalization from the virus by 90% and death by 91%." GNYHA Br. at

6-7. Even for those individuals who become infected post-vaccination,

transmission is reduced by "anywhere from 36% to 65%." *Id.* at 7; *see id.*

at 12-13. And the emergency rule is narrowly tailored because it is

limited to a discrete sector, healthcare workers, "most likely to come into

regular contact with [individuals] for whom the consequences of

contracting COVID-19 are likely to be most severe," *Mills*, 2021 WL

4860328, at *8.

Contrary to plaintiffs' argument (at 50-51), DOH did consider

alternative approaches, such as masking and testing, but concluded that

---

[9] Plaintiffs argue (at 49-50) that defendants must show a compelling interest in denying a religious exemption, but that was not the analysis applied in *Roman Catholic Diocese*, where the Court framed the relevant interest as "[s]temming the spread of COVID-19." 141 S. Ct. at 67.

they were inadequate to achieve DOH's goal of preventing COVID-19 transmission in healthcare settings. See Appellants' Br. at 53-58. Maine similarly rejected testing alternatives as "ineffective" because the Delta variant can be transmitted "within twenty-four to thirty-six hours of exposure," and rapid tests "are too inaccurate and too hard to reliably secure." *Mills*, 2021 WL 4860328, at *3. GNYHA has concurred that, based on its experience, "frequent (for example, weekly) testing is costly, cumbersome to implement and enforce, and, worst of all, not foolproof." GNYHA Br. at 14. Similarly, the use of personal protective equipment, including masks, "reduced but did not eliminate the possibility of spreading COVID-19 in healthcare facilities." *Mills*, 2021 WL 4860328, at *3. Indeed, the First Circuit noted that "four of fourteen known COVID-19 outbreaks in Maine were occurring at health care facilities with strong infection control programs." *Id.* (quotation marks omitted); *see also* GNYHA Br. at 9 (noting that "transmission is possible even when health-care workers use appropriate PPE"), 11 (despite safety measures, trans-mission may occur among frontline workers and "the administrative and other staff with whom they regularly interact").

18

Plaintiffs insist (e.g., Br. at 8-9) that these approaches should be good enough because the healthcare sector employed them in 2020. But this argument simply ignores the fact that the vaccines were *not available* at that time—and that COVID-19 ravaged the healthcare sector despite the use of these precautions. DOH was not required to ignore a more effective approach to reducing COVID-19 transmission simply because before vaccines were available DOH used less effective methods.

Plaintiffs also argue (at 23-24, 51-53) that DOH has failed to show narrow tailoring because New York allows religious exemptions or alternative compliance mechanisms for certain vaccine rules (such as the flu vaccine), and other jurisdictions allow religious exemptions from COVID-19 vaccine requirements. But New York need not adopt uniform vaccination policies for all communicable diseases across all settings. For example, plaintiffs point to the fact (at 24) that Public Health Law § 2165 allows a religious exemption from measles and rubella vaccination requirements for postsecondary students; but the same requirements for healthcare workers have not allowed religious exemptions for decades, reflecting the distinct risks and vulnerabilities of the healthcare setting. See Appellants' Br. at 6 & n.1. Likewise, defendants have already

explained why the flu vaccination regulation (which permits masking as an alternative to vaccination) is not an appropriate model for dealing with COVID-19, which more closely resembles measles and rubella in transmissibility and deadliness. See Appellants' Br. at 55 & n.37.

Contrary to the district court's reasoning (S.A. 31), DOH was also not obligated to follow the choice of other States that have allowed religious exemptions from COVID-19 vaccination requirements. "It is one of the happy incidents of the federal system that a single courageous state may" chart its own course and depart from the policies of other States. *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). As defendants have explained (see *supra* at 17-18), DOH did consider but rejected alternatives to vaccination here. And New York's choice is hardly unique. Other States, including California, Connecticut, Maine, Mississippi, and West Virginia, do not provide for religious exemptions from their mandatory vaccination requirements for school-children.[10] See Appellants' Br. at 33-34. And Maine and Rhode Island

---

[10] Plaintiffs' suggestion that these vaccination requirements are distinguishable because States have greater authority to regulate children (Br. at 22) is misplaced. State regulations over public health are likewise entitled to significant deference. *See, e.g.*, *Kentucky v. Beshear*, 981 F.3d

(*continued on the next page*)

have similarly required healthcare workers to receive a COVID-19 vaccination without providing a religious exemption. *See Mills*, 2021 WL 4860328, at \*1; *Dr. T.*, 2021 WL 4476784, at \*3.

In any event, New York's unique experience with COVID-19 would justify even a truly unique approach to protecting the healthcare sector here. New York bore the brunt of the initial wave of COVID-19, which tore through New York City in March and April 2020. As GNYHA has observed in describing that time period, "[d]uring the first wave, healthcare workers were much more likely to contract the virus than the general population," and "[r]ates of infection and death were highest among frontline staff, such as nurses and physicians."[11] GNYHA Br. at 3. Given New York's experience at the forefront of responding to the COVID-19 pandemic in the United States, it is entirely unsurprising that New York would be a leader in mandating COVID-19 vaccinations for all healthcare workers medically eligible to receive one.

---

505, 510 (6th Cir. 2020) (motion order); *Burlington N. R. v. Nebraska*, 802 F.2d 994, 999 (8th Cir. 1986).

[11] Plaintiffs are thus mistaken to claim (at 53-54) that healthcare workers are just as likely to be infected in the community as in a healthcare setting.

**B.    DOH's Emergency Rule Is Not Preempted by Title VII.**

Plaintiffs are also unlikely to succeed on their claim invoking Title VII. As plaintiffs do not dispute (at 31), they cannot assert a direct claim under Title VII against defendants, who are not their direct employers. See Appellants' Br. at 58-61. And plaintiffs have failed to show the type of irreconcilable conflict between Title VII and DOH's emergency rule that would be necessary to establish federal preemption, for at least two reasons.

*First*, plaintiffs have failed to show that the emergency rule would wholly prohibit their employers from providing an accommodation that would be required by Title VII. As plaintiffs acknowledge (*see* Br. at 30-31), Title VII does not require that employees with religious objections be entirely exempted from work rules; instead, employers have flexibility to modify an employee's tasks or working conditions. *See Brown v. F.L. Roberts & Co.*, 419 F. Supp. 2d 7, 14 (D. Mass. 2006). Nothing on the face of the emergency rule prohibits such accommodations. *See Mills*, 2021 WL 4860328, at *3 (reaching similar conclusion regarding Maine's rule). For example, plaintiffs agree that telemedicine is not covered by the emergency rule (at 25) and thus remains an available activity for

22

unvaccinated healthcare workers. And contrary to plaintiffs' assertions (at 25), telemedicine is not the only available accommodation: healthcare facilities could also assign religious objectors to other remote work, or any other type of activity that would not cause the worker to expose others to COVID-19 if he or she were infected.[12] Moreover, employers have ample incentive to offer reasonable accommodations where they can do so without undue hardship because mere compliance with the emergency rule is not a defense to a Title VII claim. *See Gulino v. New York State Educ. Dep't*, 460 F.3d 361, 380 (2d Cir. 2006).

Plaintiffs argue (e.g., Br. at 26, 29) that the emergency rule precludes employers from offering the particular accommodation that they would prefer—namely, continuing their "front-line" work with

---

[12] Plaintiffs baselessly assert that this position is a "litigation-motivated rewrite" of the emergency rule (Br. at 2). In fact, the defendants' argument merely reflects the emergency rule's limited application to "covered personnel," who are defined as workers who "engage in activities such that if they were infected with COVID-19, they could potentially expose other covered personnel, patients or residents to the disease," 10 N.Y.C.R.R. § 2.61(a)(2), (c). Workers whose activities do not fall within this definition are simply not covered by the emergency rule at all. It thus follows from the plain language of the emergency rule that an employer could remove a worker from the emergency rule's application by assigning him or her to such noncovered activities.

23

patients and residents despite being unvaccinated (e.g., *id.* at 8)—but Title VII does not require that they receive their preferred accommodation. *See Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002). And on this threadbare record, plaintiffs have not established whether they have requested (or whether their employers have offered) reassignments or other adjustments that would remove them from the scope of the emergency rule and allow them to continue working without exposing other personnel, patients, or residents to COVID-19. Plaintiffs have thus failed to establish that the emergency rule is preempted because it prohibits all reasonable accommodations that would be required by Title VII.

*Second*, plaintiffs have not shown an irreconcilable conflict between the emergency rule and Title VII because the accommodation they prefer—working directly with patients, residents, and other personnel while remaining unvaccinated—is not *required* by Title VII, even assuming that other accommodations were not available. As defendants have explained (Appellants' Br. at 64-65), Title VII requires employers only to make *reasonable* accommodations that do not impose more than "a de minimis cost." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977). Indeed, plaintiffs agree that employers are "free to deny religious

24

accommodations" if they pose an "undue risk." Br. at 19; *see Mills*, 2021 WL 4860328, at *10 (plaintiffs not entitled to religious exemption under Title VII because it would cause an undue hardship).

Courts have repeatedly upheld this principle. For example, the Seventh Circuit rejected claims that Title VII requires a police force to offer religious accommodations to officers who have religious objections to enforcing particular criminal laws or protecting particular victims because such accommodations would impose an undue hardship on the employer. *See Endres v. Indiana State Police*, 349 F.3d 922, 925 (7th Cir. 2003). In that case, the plaintiff objected to working at a casino, arguing that that line of business violated his religious beliefs. *See id.* at 923. The court explained that plaintiffs' demand was "unreasonable to require any police or fire department to tolerate," and that Title VII did not require shift-swapping arrangements as they would impose at least a de minimis cost on the employer. *Id.* at 927. Other decisions likewise confirm the principle that no accommodation is required when plaintiffs' proffered accommodation would impose more than a de minimis cost.[13] And, as

_____

[13] *See Hardison*, 432 U.S. at 84; *Kalsi v. New York City Tr. Auth.*, 62 F. Supp. 2d 745, 758 (E.D.N.Y. 1998) (termination of employee who

(*continued on the next page*)

defendants have previously explained (Appellants' Br. at 65-67), allowing unvaccinated healthcare workers to continue interacting with others imposes far more than a de minimis cost here.

Plaintiffs respond (e.g., Br. at 29-30) that some employers may *want* to allow an unvaccinated healthcare worker to continue coming into contact with other people, and that the emergency rule conflicts with Title VII by forbidding such voluntary arrangements. This argument for preemption rests on two fundamentally mistaken premises.

*First*, plaintiffs appear to assume that the religious exemptions they have been granted necessarily reflected a judgment by their employers that they faced no "undue hardship" under Title VII from having unvaccinated workers interact with others. *See, e.g.*, Br. at 26, 30.

---

could not wear hard hat for religious reasons did not violate Title VII in light of workplace safety concerns), *aff'd on op. below,* 189 F.3d 461 (2d Cir. 1999); *Sides v. New York State Div. of State Police*, No. 03-cv-153, 2005 WL 1523557, at *2, 6 (N.D.N.Y. June 28, 2005) (refusal of New York State Police to hire applicant who could not work on the Sabbath did not violate Title VII because proposed accommodation "could conceivably threaten to compromise public safety"); *cf. Hamilton v. City of New York*, No. 18-cv-4657, 2021 WL 4439974, at *6 (E.D.N.Y. Sept. 28, 2021) (New York City not obligated to afford religious exemption from grooming policy in light of federal regulation requiring firefighters to be clean shaven so that a respirator seals against their face).

That assumption is unfounded. Many employers may simply have been responding to the various temporary restraining orders issued against the emergency rule—including orders that did not involve a Title VII claim, such as this Court's stay pending appeal in *We The Patriots USA, Inc. v. Hochul*, No. 21-2179 (2d Cir. Sept. 30, 2021), ECF No. 65. Other employers may have been motivated by fear of litigation from employees like these plaintiffs, or other factors unrelated to Title VII. Plaintiffs thus have no basis beyond conjecture to surmise that the religious exemptions they have received necessarily reflect their employers' views of their Title VII obligations.

*Second*, even if a particular employer were willing to accept the risk of an unvaccinated healthcare worker, that willingness would not make the employer's accommodation one that is *required* by Title VII. Because Title VII imposes a floor but not a ceiling, employers are free to offer accommodations beyond what the federal statute would require—and States are not barred from regulating such employer decisions outside the scope of Title VII. *See California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 284-87 (1987) (rejecting preemption claim against California statute that provided pregnancy disability benefits beyond what Title VII

27

required). Indeed, Title VII respects rather than undermines the States'
traditional prerogative to regulate health and safety: as courts have
recognized, "safety considerations are highly relevant" to the question of
which accommodations may "reasonably" be offered without imposing an
"undue hardship on the conduct of the employer's business," 42 U.S.C.
§ 2000e(j). *See Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515,
521 (6th Cir. 1975); *cf. Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 78-
79 (2002) (Americans with Disabilities Act allows "employer[s] to screen
out a potential worker . . . not only for risks that he would pose to others
in the workplace but for risks on the job to his own health or safety"). See
*supra* at 25 n.13 (citing cases).

   Here, the emergency rule reflects DOH's expert judgment that
COVID-19 vaccination is essential to protect healthcare workers, the
vulnerable populations they serve, and the healthcare system as a whole.
Allowing unvaccinated workers to continue exposing themselves and
others to potential infection would undermine this essential health and
safety objective and impose hardships on healthcare facilities. And this
point would be true even if a particular employer were willing to overlook
such risks to retain a particular employee—just as an employer's willing-

ness to excuse a surgeon's refusal to wash her hands would not eliminate the harms caused by that decision.

Put simply, "Title VII does not require that safety be subordinated to the religious beliefs of an employee." *Draper*, 527 F.2d at 521. And nothing in Title VII supports plaintiffs' view that the statute respects only *employers'* safety concerns, while disregarding *the States'* judgments about the minimum requirements to protect health and safety in the workplace—judgments that ordinarily receive heavy weight in any preemption analysis. *See Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 715 (1985). The statute thus does not allow an employer to ignore important state health and safety regulations under the guise of complying with Title VII. In light of the risks posed by unvaccinated healthcare workers, an employer's decision to allow such a worker to continue interacting with patients, residents, and other personnel would not be compelled by Title VII because it would neither be a "reasonable" accommodation, nor one that avoids "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). And if Title VII does not require this particular form of religious exemption,

then the emergency rule cannot conflict with Title VII by excluding such an exemption. *See id.* § 2000e-7.

Plaintiffs' contrary position (e.g., Br. at 30-31) would allow private employers to determine in their sole discretion which state-law workplace safety considerations to waive for religious objectors—a waiver they could accomplish simply by expressing a willingness to grant an "accommodation" that state law would otherwise prohibit. Such an expansive reading of Title VII preemption would improperly disregard Congress's emphasis on the statute's narrow preemptive effect, and transform Title VII from a protection against workplace discrimination into a weapon that employers could invoke against state rules to which they object. See Appellants' Br. at 61-62.

In short, Title VII does not prevent DOH from imposing a neutral and generally applicable COVID-19 vaccination requirement to promote public health and workplace safety in the healthcare sector because this requirement does not compel employers to violate Title VII or forbid any accommodation that is required by that statute.

30

## POINT II

### THE BALANCE OF THE EQUITIES TIPS DECIDEDLY IN FAVOR OF DENYING A PRELIMINARY INJUNCTION HERE

Plaintiffs have failed to show that they will suffer irreparable harm absent a preliminary injunction. Their assertion that the emergency rule "prohibits Plaintiffs from working in healthcare in New York unless they undergo COVID vaccination" (at 59) is simply incorrect because, as discussed above (at 22-23), the emergency rule requires vaccination only for workers whose activities would expose others to COVID-19 infection. Because employers can thus reassign unvaccinated workers to activities that would not trigger the emergency rule's application, nothing in the rule necessarily requires employers to terminate or otherwise take adverse employment actions against such workers. And plaintiffs have failed to allege any actions they have taken to secure assignments that fall outside the scope of the emergency rule. See Appellants' Br. at 67-69.

In addition, the types of harms that plaintiffs allege are not the type that constitute irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 90-92 (1974); *Hyde v. KLS Pro. Advisors Grp., LLC*, 500 F. App'x 24, 25 (2d Cir. 2012); *Savage v. Gorski*, 850 F.2d 64, 67 (2d Cir. 1988). "Threats to Plaintiffs' careers, reputations, and the risk of bankruptcy or

foreclosure are quintessentially compensable injuries. They are not irreparable." *Harsman v. Cincinnati Children's Hosp. Med. Ctr.*, No. 21-cv-597, 2021 WL 4504245, at *4 (S.D. Ohio Sept. 30, 2021) (quotation marks omitted).

To be sure, the States' Eleventh Amendment immunity bars plaintiffs from recovering money damages against the named defendants in this lawsuit. *See Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011). This Court has at times recognized that the unavailability of a damages remedy against the State could make financial injury irreparable. *See United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983). But that principle does not apply here because plaintiffs could be made whole through monetary and nonmonetary remedies against their employers.

Specifically, to the extent that plaintiffs' Title VII rights are violated, they may pursue remedies against their employer, including reinstatement and backpay. *See* 42 U.S.C. § 2000e-5(g)(1). Although the employers are not parties here, courts have repeatedly looked to remedies outside the context of a particular case to determine whether an asserted

injury is truly irreparable.[14] And plaintiffs are wrong to assert that the emergency rule would automatically bar all Title VII claims against their employers (Br. at 57), since an employer's compliance with state law standing alone is not a defense to a valid Title VII claim. *See Gulino*, 460 F.3d at 380. Moreover, even if plaintiffs could not recover monetary damages, plaintiffs have not even attempted to quantify and establish with corroborating evidence the amount or magnitude of economic harm they will supposedly face to show that any harm they may face is indeed irreparable.[15] *See Regeneron Pharm., Inc. v. United States Dep't of Health & Human Servs.*, 510 F. Supp. 3d 29, 39 (S.D.N.Y. 2020).

---

[14] *See, e.g.*, *Inmates of Attica Corr. Facility v. Rockefeller*, 453 F.2d 12, 21 (2d Cir. 1971) (denying injunction against interrogations because adequate remedy at law exists in filing suppression motion in future criminal proceedings); *Travis v. Pennyrile Rural Elec. Co-op.*, 399 F.2d 726, 729 (6th Cir. 1968) (injunction against condemnation proceeding inappropriate because all complaints could be presented at actual condemnation hearing); *Jackson v. I.R.S.*, No. 97-0365-J, 1997 WL 375365, at *3 (S.D. Cal. Mar. 17, 1997) (taxpayer seeking to quash deficiency notice failed to establish irreparable harm in light of adequate remedy at law by, e.g., suing for a refund in future proceeding).

[15] Plaintiffs mistakenly rely on *Wisconsin v. Yoder* (at 58-59), which did not concern a preliminary injunction or an assessment of irreparable harm. The Supreme Court's holding that a $5 fine may burden an individual's First Amendment rights is a distinct question from whether a monetary loss imposes irreparable harm sufficient to justify injunctive relief. *See* 406 U.S. 205 (1972).

33

Defendants have also shown that the emergency rule does not cause irreparable harm by compelling plaintiffs to violate their religious beliefs. See Appellants' Br. at 69-70. Plaintiffs are not being "vaccinated against [their] will"; rather, they "are choosing whether to comply with a condition of employment, or to deal with the potential consequences of that choice." *Beckerich v. St. Elizabeth Med. Ctr.*, No. 21-cv-105, 2021 WL 4398027, at *7 (E.D. Ky. Sept. 24, 2021). As a New York state court recently noted when denying a preliminary injunction of a requirement that court officers receive a COVID-19 vaccine, "[t]he choice between accepting a vaccination that one is strongly against on the one hand and the loss of employment on the other, may appear to be no choice at all. But in reality, it is just that." *Matter of Civil Serv. Emps. Ass'n v. New York State (Unified Ct. Sys.)*, Index No. 908328-21, 2021 WL 4929983, at *11 (Sup. Ct. Albany County Oct. 15, 2021), NYSCEF Doc. No. 100; *see Kheriaty v. Regents of Univ. of Cal.*, No. 21-cv-1367, 2021 WL 4714664, at *9 (C.D. Cal. Sept. 29, 2021) (interest in preventing transmission of COVID-19 outweighs harm in "choosing between receiving a medically-approved vaccination or suffering undetermined employment-related consequences"); *Norris v. Stanley*, No. 21-cv-756, 2021 WL 4738827, at *4 (W.D. Mich. Oct. 8, 2021).

In sharp contrast to plaintiffs' failure to show imminent irreparable harm, the public would suffer serious harms if this Court affirmed the preliminary injunction against the enforcement of DOH's emergency rule. A State's "interest in safeguarding its residents is paramount." *Mills*, 2021 WL 4860328, at *11. And as defendants have explained, achieving high vaccination rates in vulnerable settings, where immunocompromised patients are especially susceptible to COVID-19, is of the utmost importance. Moreover, the vaccination requirement will also protect others who need emergency medical treatment from the consequences of staffing shortages and overstrained emergency rooms that could follow a COVID-19 outbreak among healthcare workers. See Appellants' Br. at 70-72. The balance of the equities thus tips sharply in favor of reversing the preliminary injunction here.

# CONCLUSION

For the reasons set forth above and in appellants' opening brief, this

Court should reverse the district court's preliminary injunction.

Dated:  New York, New York
        October 25, 2021

                                    Respectfully submitted,

                                    LETITIA JAMES
                                       *Attorney General*
                                       *State of New York*
                                    Attorney for Appellants


                            By:  */s/ Mark S. Grube*
                                    MARK S. GRUBE
                                    Assistant Solicitor General

BARBARA D. UNDERWOOD
   *Solicitor General*              28 Liberty Street
STEVEN C. WU                        New York, NY 10005
   *Deputy Solicitor General*       (212) 416-8028
MARK S. GRUBE
   *Assistant Solicitor General*
       *of Counsel*

36

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Kelly Cheung, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,986 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

 /s/ Kelly Cheung